Paul ISELY, Plaintiff,

v.

**CAPUCHIN PROVINCE, et al., Defendants.**

**No. 93–CV–74820–DT.**

United States District Court, E.D. Michigan, Southern Division.

March 16, 1995.

See also 877 F.Supp. 1055.

Heidi L. Salter and Don Ferris, Ann Arbor, MI, for plaintiff.

James N. Martin and Michael R. Janes, Mt. Clemens, MI, for defendants Capuchin, St. Lawrence, Thiel, Hoelscher, Kowalsky, Werner Wolf and Smith

Frank W. Brochert, Detroit, MI, for Jim Wolf.

Gerald Boyle, Milwaukee, WI, for defendant Leifeld.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT/JUDGMENT AS A MATTER OF LAW

ROSEN, District Judge.

### I. INTRODUCTION

This matter is presently before the Court on the Motion of Defendants Capuchin Province, St. Lawrence Seminary, Lloyd Thiel, Kevin Hoelscher, Myron Kowalsky, Werner Wolf and Ron Smith (the "non-abuser Defendants") for Judgment as a Matter of Law pursuant to Fed.R.Civ.Pro. 50 and, on the separate "Motion for Directed Verdict" [1] filed

---

1. Rule 50 was revised in 1991, and that revision abandoned the terminology "directed verdict". The standards applicable to "judgments as a matter of law", however, remain the same as the standards under the former "directed verdict".

*See* Advisory Committee Notes on the 1991 Amendment to Fed.R.Civ.Pro. 50. Although Defendants have used the terms directed verdict and judgment as a matter of law interchange-

by individual Defendant Jim Wolf. Both of these motions were submitted to the Court after Plaintiff concluded his proofs. The Court deferred ruling on the motions until the Defendants concluded their case, as well.

Having reviewed and considered the briefs filed by the moving Defendants and the opposition briefs filed by Plaintiff,[2] and having heard the oral arguments of counsel at the hearing held on March 15, 1995, the Court is now prepared to rule on these motions. This *Opinion and Order sets forth that ruling.*

## II. *SUMMARY OF PLAINTIFF'S CLAIMS AGAINST THE VARIOUS DEFENDANTS*

In his Complaint, Plaintiff has asserted 17 counts. With respect to the two individuals Plaintiff accuses of actually abusing him, Defendants Gale Leifeld and Jim Wolf, Plaintiff has alleged that these two Defendants sexually molested him while he was a student at St. Lawrence Seminary in Fond–du–Lac, Wisconsin and while he was a resident at the Pre–Novitiate house, in Detroit, Michigan. He has asserted three separate causes of action against each of these two individuals: "intentional misconduct" (Counts I and IX); "common law negligence" (Counts II and X); and "professional negligence" (Counts III and XI).

As to the non-abuser Defendants, Plaintiff has alleged the following claims:

(A) "Breach of Contract"

- Against St. Lawrence Seminary [Count V];
- Against the Capuchin Detroit Pre–Novitiate Program [Count XIII]; and
- *Against the Capuchin Province [Count XVII].*

(B) "Statutory Negligence" (for failure to report the alleged abuse of Jim Buser and Gale Leifeld in violation of the Wisconsin Reporting Statute):

- Against Kevin Hoelscher [Count VI];
- Against Lloyd Thiel [Count VII];
- Against Myron Kowalski [Count VIII];
- Against St. Lawrence Seminary [Count IV];
- Against the Capuchin Province [Count XVI].

(C) "Common Law Negligence"

(1) predicated upon the alleged actions of Jim Buser and Gale Leifeld in Wisconsin:

- Against Kevin Hoelscher [Count VI];
- Against Lloyd Thiel [Count VII];
- Against Myron Kowalski [Count VIII];
- Against St. Lawrence Seminary [Count IV];
- Against the Capuchin Province [Count XVI]; and

(2) predicated upon the alleged actions of Jim Wolf in Detroit:

- Against the Capuchin Pre–Novitiate Program [Count XII];
- *Against Werner Wolf [Count XIV];*
- Against Ron Smith [Count XV];
- Against Lloyd Thiel [Count VII]; and
- Against the Capuchin Province [Count XVI].

Plaintiff has asserted several theories of "common law negligence" under which he seeks to impose liability on the nonabuser Defendants, to-wit:

- negligent hiring of Jim Buser, Gale Leifeld and Jim Wolf;
- negligent supervision of Buser, Leifeld and Jim Wolf;
- failure to warn Plaintiff or his parents that Buser, Leifeld and Jim Wolf were sex abusers and failure to prevent their sex abuse of him; and
- failure to adopt a sexual abuse policy.

---

ably, the Court will use the term "judgment as a matter of law" in this Opinion and Order.

**2.** In addition to their Brief specifically filed in support of their Rule 50 Motion, the non-abuser Defendants have filed two "Supplemental Briefs" in further support of their Motion, and also have incorporated by reference the various Memoran-

da of Law they submitted during the course of trial regarding punitive damages, negligence *per se,* and First Amendment issues. Plaintiff also responded to these various other briefs. The Court has reviewed and considered all of these briefs in considering the Rule 50 motions presently before it.

Integral to his Complaint against all of the Defendants is Plaintiff's contention that he repressed the memories of most of Buser's, Leifeld's and Jim Wolf's abuse of him until late in 1992, thus tolling the statutes of limitations on his claims arising out of these incidents.[3]

## III. DEFENDANTS' ARGUMENTS FOR JUDGMENT AS A MATTER OF LAW.

### Arguments of the Non Abuser Defendants

The non-abusing Defendants argue that a judgment as a matter of law under Rule 50 should be entered in their favor on Plaintiff's breach of contract claims because Plaintiff has not presented evidence of a contract or its material terms with respect to either his education at St. Lawrence Seminary or his stay at the Detroit Pre–Novitiate House. With respect to Plaintiff's claims of statutory negligence for failure to report alleged sexual abuse by Fathers Buser and Leifeld, the non-abusing Defendants contend that Plaintiff has not demonstrated that the Wisconsin Reporting Statute was violated by any of them, and even if he has presented factual evidence to establish a breach of the statute's terms, a violation of the statute cannot, as a matter of law, support a private cause of action.

As for Plaintiff's claims of common law negligence, the nonabusing Defendants assert several arguments. First, they argue, with respect to Plaintiff's Wisconsin claims of negligent hiring and negligent supervision, that Wisconsin does not recognize such claims as independent causes of action. They further argue that, even if claims of negligent hiring/negligent supervision were cognizable under Wisconsin law, this Court is without jurisdiction to adjudicate such claims in this case because to do so would amount to excessive entanglement with religion and would violate the First Amendment of the

U.S. Constitution and the Wisconsin Constitution, as well.

With respect to Plaintiff's claim that the non-abusing Defendants are liable for failure to warn him of, and failure to prevent, his sexual abuse by Fathers Buser, Leifeld and Jim Wolf, Defendants contend that Plaintiff has not presented evidence establishing that he reported his abuse by these priests, and he has not shown that any supervisory non-abusing Defendant was put on notice of Father Buser's, Leifeld's or Jim Wolf's sexual activities prior to Plaintiff's alleged abuse by them so as to impose liability upon the non-abusers, the seminary or the Order.

As to Plaintiff's claim of failure to have a sexual abuse policy in place, Defendants contend that this claim must be dismissed as well because Plaintiff has not shown that the Defendants had any statutory or common law duty to have a sexual abuse policy.

Defendants further argue with regard to all of Plaintiff's theories of common law negligence, that even if Plaintiff has shown that they were negligent, dismissal of the negligence claims is nonetheless required because Plaintiff has not established that the negligence of the non-abusers proximately caused his alleged damages.

Finally, the non-abusing Defendants contend that the evidence presented does not support Plaintiff's claims for punitive damages. Therefore, they seek dismissal of all of Plaintiff's allegations of punitive damages as to the non-abuser Defendants.

### Defendant Jim Wolf's Arguments[4]

Defendant Jim Wolf has separately moved for entry of judgment as a matter of law in his favor. His argument is that Plaintiff has not presented sufficient evidence to warrant submitted the case against him to the jury because he has not presented sufficient evidence to establish that the alleged sexual abuse by Jim Wolf occurred or that Plaintiff could not have discovered the alleged abuse less than three years before he filed this

---

**3.** The Court earlier ruled that the issue of whether such incidents were truly repressed and, if so, when Plaintiff had sufficient recollection of the incidents for purposes of commencing the running of the statutes of limitations were issues for the jury.

**4.** The other individual Defendant accused of abuse, Gale Leifeld, has filed no dispositive motions, nor has he joined in any of the other Defendants' motions.

lawsuit. With respect to this latter issue, Defendant Jim Wolf argues that the testimony of Plaintiff's psychological experts is insufficient to allow a reasonable juror to conclude that the repressed memory theory is scientifically valid, and therefore, a directed verdict on this basis alone is required.

## IV. DISCUSSION

### A. STANDARDS APPLICABLE TO A RULE 50 MOTION FOR ENTRY OF A JUDGMENT AS A MATTER OF LAW

Motions for entry of judgment as a matter of law (formerly known as "directed verdict" motions) are governed by Fed.R.Civ.Pro. 50(a), which provides:

**(a) Judgment as a Matter of Law.**

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitle to the judgment.

Fed.R.Civ.Pro. 50(a).

■ Although the issue of whether the court should enter a judgment as a matter of law is a matter usually raised by a party by way of motion, it is well-settled that the district court also has the power to grant such judgments *sua sponte*, even when no motion is made. *Safeway Stores v. Fannan*, 308 F.2d 94, 99 (9th Cir.1962); *Peterson v. Peterson*, 400 F.2d 336, 343 (8th Cir.1968).

**5.** This is the rule of the Seventh Circuit, as well. *See McGeshick v. Choucair*, 9 F.3d 1229, 1235

### State Law Standards Apply

■ It is well-established in this Circuit that a federal district court sitting in diversity is to apply the standard for judgment as a matter of law used by the courts of the state whose substantive law governs the action. *American & Foreign Ins. Co. v. General Electric Co.*, 45 F.3d 135 (6th Cir.1995); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir.1991).[5] In this case, Michigan law applies to the claims predicated upon events that allegedly occurred at the Detroit Pre–Novitiate House, and Wisconsin law applies to the claims arising out of events that occurred in Wisconsin.

According to Michigan law, "[a] trial court may direct a verdict on an issue if the evidence, viewed in a light most favorable to the non-moving party, fails to give rise to a material issue of fact upon which reasonable minds could differ." *American & Foreign Ins. Co. v. General Electric Co.*, supra, quoting *Coffey v. State Farm Mutual Auto Insurance Co.*, 183 Mich.App. 723, 455 N.W.2d 740, 742 (1990).

The Wisconsin standard is similar. As summarized by the Wisconsin Supreme Court in *State of Wisconsin v. Leach*, 124 Wis.2d 648, 370 N.W.2d 240 (1985):

The test is whether there is any credible evidence which under a reasonable view would support a verdict contrary to that which is sought. . . .

A case should be taken from the jury and a verdict directed against a party: ". . . only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion." . . .

Th[e] court must take the view of the evidence which is most favorable to the party against whom the verdict [is] sought to be directed. If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury. The weight and sufficiency of the evidence is

(7th Cir.1993).

for the jury, as is the weight to be given to the witness' positive or negative testimony. Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury. If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury.

Nevertheless, the party having the burden of proof must come forward with evidentiary facts that establish the ultimate facts; and the degree of proof must be such as to remove these ultimate facts from the field of mere speculation and conjecture. A jury cannot be allowed to merely theorize the ultimate facts from what might be a mere possibility.

*Id.,* 370 N.W.2d at 249 (citations omitted).

The Court will decide the motions before it by application of the foregoing principles. The Court will address the non-abuser Defendants' arguments for directed verdict first, and then will address Defendant Jim Wolf's motion and issues concerning the claims against the accused abuser defendants.

### B. *PLAINTIFF HAS NOT PRESENTED EVIDENCE OF A CONTRACT*

■ In his Complaint, Plaintiff alleges that he is a third-party beneficiary of contracts entered into by his parents with St. Lawrence Seminary and the Capuchin Province (Counts V, XIII and XVII) which he claims were breached by these Defendants by virtue of the alleged acts of sexual abuse performed by Fathers Buser and Leifeld at St. Lawrence Seminary in Wisconsin and by Jim Wolf at the Pre–Novitiate Program in Detroit. Plaintiff, however, did not put on any evidence of any contract or its agreed-upon terms. The only "evidence" presented at trial was Plaintiff's testimony that his parents paid tuition to St. Lawrence, and paid for his room and board at the Pre–Novitiate Program.

■ It is black-letter law that proof of the existence of a "contract" and its terms is a pre-requisite for an action by a third-party beneficiary to enforce a contractual duty. *See* Restatement (Second) of Contracts, § 304 ("A promise *in a contract* creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.")

■ More importantly, however, even if Plaintiff has presented evidence of a contract, its terms, and the breach thereof, the **breach of contract claims are time-barred.** The Court has ruled that Michigan statutes of limitations will govern all claims in this action, both those arising out of Michigan activities, as well as those arising out of Wisconsin activities.[6] The law in Michigan regarding the statute of limitations for breach of contract is that "[a] breach of contract claim accrues on the date of the breach, *not the date that the breach is discovered." Michigan Millers Mutual Ins. Co., et al. v. West Detroit Building Co.,* 196 Mich. App. 367, 494 N.W.2d 1, 4 n. 1 (1992).

■ Michigan's statute of limitations for breach of contract, M.C.L. § 600.5807(8), is six years. Plaintiff left St. Lawrence Seminary in 1978, therefore, at the latest, any action for breach of any contract with St. Lawrence Seminary would have to have been filed by 1984. Plaintiff spent one year in the Detroit Pre–Novitiate Program, from 1978–1979. Therefore, the latest any claim for breach of any contract pertaining to the Pre–Novitiate Program could have been filed was 1985. This action was not filed until October 1993. Clearly, Plaintiff's contract claims are time-barred.[7]

---

6. See the Court's February 10, 1995 "Opinion and Order Regarding Choice of Law", pp. 7–9.

7. Although the Court has determined that Michigan statutes of limitations will govern both those arising out of Michigan activities as well as those arising out of Wisconsin activities, the Court notes that even if Wisconsin law were to apply, the result would be the same. Wisconsin law is the same as Michigan's in this regard. The six-year Wisconsin statute of limitations begins to run on the date the breach occurs, not on the date when the breach is discovered. *CLL Associates Limited Partnership v. Arrowhead Pacific Corp.,* 174 Wis.2d 604, 497 N.W.2d 115 (1993). In the *CLL* case, the Wisconsin court specifically held that the delayed discovery rule does not apply to breach of contract claims.

Therefore, Counts V, XIII, and XVII will be *DISMISSED* in their entirety.

**C.** ***JUDGMENT AS A MATTER OF LAW WILL BE ENTERED ON PLAINTIFF'S "COMMON LAW NEGLIGENCE CLAIMS" AGAINST THE NON–ABUSER DEFENDANTS PREDICATED UPON THE ALLEGED ACTIONS OF JIM WOLF AT THE PRE–NOVITIATE PROGRAM IN DETROIT.***

Plaintiff has alleged that the non-abusing Defendants are liable for injuries he incurred as a result of sexual abuse perpetrated upon him by Father Jim Wolf at the post-high school Pre–Novitiate Program in Detroit, under theories of negligent hiring/negligent supervision; failure to warn of, and failure to prevent Jim Wolf's sexual abuse; and failure to have a sexual abuse policy in place.

He has asserted these "common law negligence" claims against the following Defendants:

- Against the Capuchin Pre–Novitiate Program [Count XII];
- Against Werner Wolf [Count XIV];
- Against Ron Smith [Count XV];
- Against Lloyd Thiel [part of Count VII]; and
- Against the Capuchin Province [part of Count XVI]

As indicated above, the Court has determined that Michigan substantive law applies to the claims predicated upon events which occurred in Michigan. The law in Michigan regarding negligent hiring/negligent retention of employees, failure to warn of an employee's propensities and failure to prevent injuries caused by the intentional conduct of an employee is that

"[T]here is no liability on the part of an employer for torts intentional or recklessly committed beyond the scope of his master's business.... [However,] the law does impose upon employers the duty of using reasonable care in the hiring of employees.... *[I]n order to find negligence in such a case, [the finder of fact must be presented with evidence demonstrating that] the employer knew or should have* known of [the employee's] propensities [to act in the complained of manner.]"

*Hersh v. Kentfield Builders, Inc.*, 385 Mich. 410, 189 N.W.2d 286 (1971). *See also, Damrow v. Holbrook–Patterson, Inc.*, 951 F.2d 348, 1991 WL 278794, 1991 U.S.App. LEXIS 30690 (6th Cir.1991) (unpublished opinion; text available on LEXIS).

■ In this case, Plaintiff admits that he has no evidence that notice of Jim Wolf's abuse was ever given to Werner Wolf, Ron Smith or anyone else. He further admits that the only basis for his claims against Lloyd Thiel is the fact that Father Thiel was the provincial (i.e., the head of the Order) at the time that he was in the Pre–Novitiate Program. He admits he never reported Jim Wolf's abuse to anyone, and he admits he has no evidence that anyone else ever reported Jim Wolf's sexual activities to Werner Wolf, Ron Smith, Lloyd Thiel, or any other Capuchin in an administrative or supervisory position connected with the Detroit Pre–Novitiate Program prior to or during 1978–1979.

■ As for the "failure to have a sex abuse policy in place", Plaintiff has presented no evidence, nor cited any law, that there existed at the time in question, any duty (either statutory or under common law) to have such a policy in place, and the Court has found no cases which might support an allegation of such a duty.

This, perhaps, reflects one of the problems, or challenges, presented to plaintiffs in repressed memory cases. At the time of the sexual abuse incidents in question, the problem of child sexual abuse was not as much in the public conscience as it is today and, consequently, the decisional precedent from courts from that time which might create a duty to have a sex abuse policy simply does not exist, nor had the policy branches of government addressed this problem. Thus, courts sitting today in cases of repressed memory are without statutory or decisional guidance as to the source or nature of any duty that might be alleged relating to past incidents of sexual abuse. However, it is clear to this Court that it would be unfair to apply contemporary standards of duty and care to create a cause of action that did not

exist at the time of the incidents. Such bootstrapping of past incidents into contemporary mores would place an undue burden on defendants attempting to defend such cases. Unfortunately, in cases of repressed memory, it may be, as here, that the law at the time simply did not provide a cause of action with an attendant remedy.

Since no evidence was presented at trial to establish that the Defendants were under any duty to have a sex abuse policy in place in 1978–1979, or that Werner Wolf, Ron Smith, Lloyd Thiel, or any other Capuchin in an administrative or supervisory position connected with the Detroit Pre–Novitiate Program were ever put on notice of Jim Wolf's sexual activities, Plaintiff's common law negligence claims against the non-abuser Defendants predicated upon Jim Wolf's alleged actions at the Detroit Pre–Novitiate Program must be dismissed.

Accordingly, Counts XII, XIV, and XV will be DISMISSED in their entirety and, with respect to Counts VII and XVI, those specific claims against Defendant Thiel and the Capuchin Order predicated upon Jim Wolf's actions at the Pre–Novitiate Program in Detroit, will also be dismissed. (The claims against Thiel and the Order predicated upon the Wisconsin actions are discussed, *infra*.)

## D. *THE WISCONSIN TORT CLAIMS AGAINST THE NON–ABUSER DEFENDANTS*

### 1. *"STATUTORY NEGLIGENCE"*

█ Plaintiff has alleged "statutory" negligence against the following Defendants for failure to report the sex abuse of Jim Buser and Gale Leifeld in violation of the Wisconsin Reporting Statute, Wisc.Stat. § 48.981:

- Kevin Hoelscher [Count VI];
- Lloyd Thiel [Count VII];
- Myron Kowalsky [Count VIII];
- St. Lawrence Seminary [Count IV]; and
- Capuchin Province [Count XVI]

During 1974–78, Kevin Hoelscher was St. Lawrence's athletic director and Myron Kowalski was a music teacher and in charge of the sophomore class. Lloyd Thiel was not at St. Lawrence at the time. He was the provincial head of the Capuchin's St. Joseph province.

At the time in question, the Wisconsin Reporting Statute was purely criminal in nature. It provided as follows:

**Reports on Abused or Injured Children.**

**(1)** A physician or surgeon ... or a nurse, social worker or *school administrator having reasonable cause to believe that a child brought to him or coming before him has had physical injury or other abuse inflicted upon him by another,* other than by accidental means, *shall orally report the same, and the facts and circumstances forming the opinion.* The report shall be made immediately by telephone or otherwise, and followed by a report in writing to a child welfare agency specified in 48.56(1) or the sheriff of the county....

\* \* \* \* \* \*

**(3)** Anyone knowingly and willfully violating this section by failing to file a report as required may be fined not more than $100 or imprisoned not more than 6 months or both.

Wisc.Stat. 48.981.[8]

Although no Wisconsin state or federal court has been called upon to decide specifi-

**8.** This statute was amended in 1979, after the incidents alleged by Plaintiff, to expand both the scope of the reporting duties and the categories of officials who had a duty to report. Included in these expanded responsibilities were school teachers and counselors. As amended in 1979, § 48.981 provides in pertinent part, as follows:

A physician, coroner, medical examiner, nurse, dentist, chiropractor, optometrist, acupuncturist, other medical or mental health professional, social worker, marriage and family therapist, professional counselor, public assistance worker, *school teacher, administrator or coun-*

*selor,* mediator under § 767.11, child care worker in a day care center or child caring institution, day care provider, alcohol or other drug abuse counselor, member of the treatment staff employed by or working under contract with a county department ..., physical therapist, occupational therapist, speech-language pathologist, audiologist, emergency medical technician or police or law enforcement officer *having reasonable cause to suspect that a child seen in the course of professional duties has been abused or neglected or having reason to believe that a child seen in the course*

**1148**

cally whether a civil negligence action can be maintained for violation of the Wisconsin Reporting Statute,[9] several courts have been called upon to decide this issue in the context of child abuse reporting statutes with virtually identical language to that of the Wisconsin statute. All of these courts have concluded that no private right of action can lie for failure to report. *See, Borne v. Northwest Allen County School Corp.,* 532 N.E.2d 1196 (Ind.App.1989), *app. denied,* 558 N.E.2d 828 (Ind.1990); *Doe "A" v. Special School District of St. Louis County,* 637 F.Supp. 1138 (E.D.Mo.1986), *aff'd,* 901 F.2d 642 (8th Cir. 1990); *Thelma D. v. Board of Education,* 669 F.Supp. 947 (E.D.Mo.1987); *Fischer v. Metcalf,* 543 So.2d 785 (Fla.App.1989).

These cases make clear that in deciding whether a violation of the reporting statute can support a private negligence cause of action, the court should consider the provisions of the statute *as a whole* to determine whether the legislature intended to authorize a civil action. Having reviewed the entire text of Section 48.981 as it existed in 1974–78, this Court finds nothing to indicate that the Wisconsin legislature intended to authorize a private cause of action for failure to report. The Court agrees with the reasoning of the Indiana Court of Appeals which explained in *Borne, supra:*

> When the provisions of the act are considered as a whole, there is no apparent intent to authorize a civil action for failure of an individual to make the oral report.... Furthermore, such an action is

not authorized at common law and its maintenance would raise substantial questions of causation since the failure would not in the direct sense, be a proximate cause of the injury to the child. It would, we believe, misdirect judicial time and attention from the very real problems of children in need of services in favor of pursuing collateral individuals, who are presumably capable of responding in money damages, on the ground that they knowingly failed to make an oral report. We conclude that was not within the legislative purpose of the act.

532 N.E.2d at 1203.[10]

■ Moreover, even assuming arguendo that a private cause of action can be maintained for violation of 48.981, Plaintiff has not presented sufficient evidence to establish that the statute was violated. The statute, by its terms requires reporting only when (1) an abuse victim is "brought before" a school administrator or "comes before" the administrator, and (2) the administrator had a "reasonable cause" to suspect that the boys were abused.

With respect to the "brought before"/"comes before" requirement, in *Landeros v. Flood,* 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976), the California Supreme Court was called upon to construe a similar requirement in the California reporting statute. The California court determined that a doctor could be held liable for violation of the statute only if the child actually appeared before him and his injuries were apparent.

*of professional duties has been threatened with abuse or neglect and that abuse or neglect of the child will occur shall, except as provided under subsection (2m), report as provided in subsection (3)....*

9. Defendants have stated in Paragraph 5 of their February 20, 1995 "Motion to Dismiss Plaintiff's Allegations of Negligence Based on the Wisconsin Reporting Statute", that

> "the Wisconsin Court of Appeals stated that with respect to the Wisconsin Reporting Statute, there was no legislative intent to create a private right of action and therefore no action could be maintained for failure to report. *Fortier v. Flambeau Plastics Co.,* 164 Wis.2d 639, 476 N.W.2d 593 (1991)."

Contrary to Defendants' representation, the case cited by Defendants, *Fortier v. Flambeau Plastics,* has absolutely nothing to do with the

Wisconsin Reporting Statute. That case is a toxic dumping case.

10. The Court notes that the Milwaukee County Circuit Court also determined that no private cause of action exists for violation of Section 48.981. In *Brown v. Archdiocese of Milwaukee,* Milwaukee County Circuit Court No. 93–CV–003237 (Sept. 26, 1994 decision), the court stated:

> ... Sec. 48.981 in this Court's opinion does not impose a duty on organizations to report abuse, nor does it create a civil cause of action. It is strictly a regulatory reporting statute that involves individuals. So the 48.981 claims will be dismissed....

[Ex. B to Defendants' Motion to Dismiss Plaintiff's Allegations of Negligence Based on the Wisconsin Reporting Statute, p. 6.]

Although this Court does not necessarily read into the statute the requirement that a child be brought physically before a school administrator before the reporting duty is triggered, the Court believes that the "brought before" language does reflect a legislative intent that the nature of the abuse report brought to the attention of the administrator be more than simply rumor, conjecture or speculation. This intent is also clearly reflected in the "reasonable cause" requirement of the statute, which is the same kind of requirement imposed in the Missouri reporting statute. In construing this provision of the Missouri statute, the court in *Doe "A"*, *supra*, explained,

> The statute does not require school teachers and *administrators to report every* **suspicion** *of abuse*. Rather, the statute specifically requires reporting on when there is a *reasonable* cause to suspect abuse. This requirement calls for the ex-

ercise of a teacher's or administrator's professional judgment.

637 F.Supp. at 1148. *See also, Rosacrans v. Kingon*, 154 Mich.App. 381, 397 N.W.2d 317 (1986), *app. denied*, 428 Mich. 862 (1987) (violation of Michigan reporting statute not established in absence of evidence showing that the defendants had reasonable cause to suspect abuse.)

In this case, there was trial testimony that at St. Lawrence Seminary, the athletic director is deemed to be an "administrator".[11] As indicated above, Kevin Hoelscher was the athletic director at St. Lawrence during the period of time in question. However, Plaintiff has presented no evidence to establish that any alleged abuse victim personally reported his own sexual abuse to Hoelscher.[12] Hoelscher testified only that he had "heard rumors" about Leifeld.[13]

11. The Court questions whether an "athletic director" would, in 1975–76 have been deemed by the Wisconsin legislature to be a "school administrator" subject to the provisions of the Reporting Statute prior to the 1979 revision of the act which added "teachers" to the list of persons required to report abuse. It seems to the Court that the legislature would have deemed only those supervisory school employees who had hiring, firing, evaluative and disciplinary authority to be "school administrators". While Defendants have cited a number of cases and a statute which they contend establish such a definition of school administrators, *none* of the cases nor the statutory provision cited by Defendants stand for this proposition.

Defendants rely upon *Crear v. Labor & Indus. Review Com.*, 114 Wis.2d 537, 339 N.W.2d 350 (1983); *Madison Teachers, Inc. v. Madison Metro School District*, 159 Wis.2d 429, 464 N.W.2d 679, 1990 WL 250225 (1990); *State v. Crisdhome Farms, Inc.*, 115 Wis.2d 696, 339 N.W.2d 366, 1983 WL 162058 (1983); and Wis.Stat. § 40.02(55), as support for their contention that only school personnel with the authority for hiring, firing and discipline are deemed to be "school administrators" in Wisconsin. The *Crear* case does not involve teachers or school administrators, at all. That case involved the issue of who was a "supervisor" of a department of social services social worker. The *Madison Teachers* case dealt with collectively-bargained definitions of teachers' union employees and whether a teacher could be deemed a "supervisor" of a classroom aide under the Municipal Employment Relations Act. *State v. Crisdhome Farms* did not involve any employer/employee relationship. That case involved a civil forfeiture action imposed as a penalty upon the defendant for dump-

ing waste in a river. As for the cited statute, § 40.02(55) addresses the question of which school employees are entitled to participate in the Wisconsin teachers retirement plan.

Not having been presented with any legal authority that school administrators are only those with hiring/firing authority, the Court is left with the uncontroverted trial testimony of Father Brian Braun that at St. Lawrence the athletic director was considered an administrator.

12. The only evidence of face-to-face personal reports to administrators is Paul Isely's testimony about telling Hoelscher of Leifeld's massaging his shoulders and running his hand down his chest to his belt line and David Grieber's testimony about telling Father Zickert about Jim Buser having "hurt him" and having called him stupid. However, because the Court has determined that the statute cannot support a private civil cause of action, the Court need not reach the issue of whether these reports might constitute a sufficient basis under the statute for giving a school administrator reasonable cause to believe that sexual abuse occurred.

13. Even if the statute were deemed to support a private cause of action, and even if the statute were found to have been violated, dismissal of the statutory negligence claims against St. Lawrence and the Capuchin Province would still be required because there can be no vicarious liability for an individual's violation of a statute which mandates actions only on the part of the individual. *Thelma D. v. Board of Education, supra* (liability for a teacher's failure to report abuse cannot be imputed to the School Board.)

For these reasons, Plaintiff's "statutory negligence" claims against Kevin Hoelscher Lloyd Thiel and Myron Kowalski in Counts VI, VII and VIII, and the claims against St. Lawrence Seminary in Count IV and the Capuchin Province in Count XVI will be dismissed.[14]

## 2. COMMON LAW NEGLIGENCE

Plaintiff also claims that the non-abuser Defendants are liable to him for being abused by Leifeld and Buser under several theories of "common law negligence". Specifically, Plaintiff alleges theories of:

(a) negligent hiring/retention of Buser and Leifeld;

(b) negligent supervision of Buser and Leifeld;

(c) failure to warn Plaintiff or his parents that Leifeld and Buser were sex abusers, and failure to prevent their sex abuse of him; and

(d) failure to adopt a sexual abuse policy.

The Court will address each of these theories *ad seriatim.*

### (a) *Negligent Hiring*

Plaintiff claims that the Capuchin Order negligently "hired", and negligently retained, Fathers Buser and Leifeld as priests.[15] Questions of hiring and retention of clergy necessarily will require interpretation of church canons, and internal church policies and practices.

It is well-settled that when a court is required to interpret Canon Law or internal church policies and practices, the First Amendment is violated because such judicial inquiry would constitute excessive government entanglement with religion. *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). *See also: Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (civil courts may not inquire into clergy hiring decisions of church); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952) ("Freedom to select the clergy ... must now be set to have federal constitutional protection as part of the free exercise of religion against state interference." *Id.* at 116, 73 S.Ct. at 154); *Rayburn v. General Conference of Seventh Day Adventists,* 772 F.2d 1164 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); *Van Osdol v. Vogt,* 892 P.2d 402 (Colo.App.1994).[16] This is true whether the "hiring" at issue is church hiring *per se* or the hiring of school personnel for a church-run school. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("Because religious authority necessarily pervades a church-operated school, personnel decisions affecting the school may involve ecclesiastical issues as much as decisions affecting church employees." *Id.* at 502, 99 S.Ct. at 1319). *See also, Black v. St. Bernadette Congregation,* 121 Wis.2d 560, 360 N.W.2d 550 (Wis.App.1984) (discharge of a lay principal of a Catholic school not reviewable by court).

The foregoing cases make clear that any inquiry into the decision of who should be permitted to become or remain a priest necessarily would involve prohibited excessive entanglement with religion. Therefore, Plaintiff's claims of negligence predicated

---

14. To the extent that Plaintiff has also argued that violation of the statute establishes a *claim* of "negligence *per se*", that claim is also dismissed. As the Court explained on the record at the March 15, 1995 hearing on these motions, negligence *per se* relates to the *standard of care* that would be applicable to a cause of action based on a statutory violation *if* such a cause of action existed; it does *not* create a new duty giving rise to a separate cause of action. Thus, because there is no private cause of action for failure to make a § 48.981 report, the issue of negligence *per se* does not arise in this case.

15. As indicated, *supra,* Plaintiff has also asserted this negligent hiring/negligent retention claim against St. Lawrence Seminary and individual Defendants Lloyd Thiel and Myron Kowalsky.

16. Excessive entanglement with religious tenets also violates the Wisconsin Constitution. *See Olston v. Hallock,* 55 Wis.2d 687, 201 N.W.2d 35 (1972); *Black v. St. Bernadette Congregation,* 121 Wis.2d 560, 360 N.W.2d 550 (Wis.App.1984).

upon a "negligent hiring" theory will be dismissed.[17]

### (b) *Negligent Supervision*

It is true that some courts have held that whenever a court is called upon to impose a standard of care on clerics—whether in hiring or in *supervising* other clerics—First Amendment excessive entanglement issues arise which preclude civil court adjudication. *See e.g., Dausch v. Rykse,* 52 F.3d 1425 (7th Cir.1994); *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991); *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994).

However, the Supreme Court has made clear that if only "neutral" principles of law can be applied without determining underlying questions of church law and policies, then a court may intervene. *Serbian E. Orthodox Diocese, supra; Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) ("A way of life, however virtuous and admirable, may not be interposed as a barrier to a reasonable state regulation ... if it is based on purely secular considerations." *Id.*) *See also, Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927 (1992); *Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988); *Moses v. Diocese of Colorado, supra* (application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution).

■■■ In this case, the Court believes that, unlike in the case of hiring decisions, matters pertaining to the supervision of Fathers Bus-

er and Leifeld can be decided without determining questions of church law and policies. Therefore, the Court finds that no First Amendment issues are implicated which would mandate dismissal of the negligent supervision claims.

However, as all parties acknowledge in this case, the Wisconsin Supreme Court has never explicitly recognized a cause of action for negligent supervision,[18] and the most recent decisions of the Wisconsin Court of Appeals have also refused to find such a cause of action. *See Jane Doe v. Archdiocese of Milwaukee,* 188 Wis.2d 79, 524 N.W.2d 647 (1994) (unpublished opinion; text available on LEXIS); *Pritzlaff v. Archdiocese of Milwaukee,* 188 Wis.2d 79, 524 N.W.2d 647 (1994) (unpublished opinion; text available on LEXIS); *Sherrill v. Smart,* 181 Wis.2d 366, 514 N.W.2d 422 (Wis.App.1993) (unpublished opinion; text available on LEXIS).

In *Pritzlaff* the court explained:

> The author of this opinion concludes ... that the amended complaint states no ground for relief because the Wisconsin Supreme Court has not explicitly recognized the tort of negligent supervision.... the supreme court has sustained causes of action analogous to the tort of negligent supervision of employees in the past, and it might choose to explicitly sustain such a cause of action in the future. This writer is reluctant, however, to recognize a new cause of action in this case. This court is not primarily a law-developing or law-de-

**17.** The cited authorities also make it clear that Plaintiff may not rely upon Canon Law or any purported violation thereof to establish any of his claims of negligence in this action. Furthermore, even if the entanglement issue did not preclude judicial inquiry, there was absolutely not a shred of evidence in the record that either the Capuchin or St. Lawrence Defendants had any notice of the abuse proclivities of Fathers Buser of Leifeld prior to their "hiring" of them as priests or teachers at St. Lawrence. The "negligent retention" claim is simply another rubric for Plaintiff's "negligent supervision" claims, discussed, *infra.*

**18.** The only case in which the Wisconsin court has recognized a cause of action even related to "negligent supervision" involved a hospital being

found to have negligently granted a orthopedic surgical privileges to a doctor and held liable for failing to do a pre-hire check on a surgeon's claimed past hospital affiliations and certifications in violation of statutory requirements imposed upon hospitals. *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156 (1981). At best, the case could be construed as a "negligent hiring" case. No mention, however, is made in *Johnson* of a "common law" cause of action for negligent hire or the elements set forth in the Restatement. Cases subsequent to *Johnson* have characterized that decision as involving "special circumstances", and essentially a theory of liability for medical malpractice. *See* cases discussed *infra* in the text of this Opinion.

**1152**

claring body. . . . For this court to extend a religious body's liability to negligent supervision—in effect, to declare a new cause of action in Wisconsin—is to step out of its primary error-correcting function and assume a role more properly left to the supreme court.

In *Gallun v. Soccer U.S.A.*, 184 Wis.2d 401, 516 N.W.2d 789 (1994) (unpublished opinion; text available on LEXIS), the plaintiff, a women's soccer player, sued a soccer club under a theory of negligent hiring, training, supervision and retention of a soccer club maintenance employee who clandestinely videotaped the plaintiff changing clothes in the club's locker room through a "peep hole" in the locker room ceiling.

The trial court noted that the tort of negligent supervision has not been recognized by the Wisconsin Supreme Court but assumed, for the sake of the defendant's summary judgment argument that the tort existed under Wisconsin law. The court nonetheless dismissed the cause of action on the defendants' summary judgment motion because the court found that the record did not provide any basis for a reasonable inference that there was a foreseeability of probable harm in failing to supervise the employee more closely, and the appellate court affirmed.

In *Sherrill v. Smart, supra*, a case relied upon by Plaintiff here, the plaintiff sued the owners of a tavern for injuries sustained when he was shot in the back by the tavern's bouncer during a confrontation between the bouncer, the plaintiff and several others. The plaintiff alleged two theories of recovery from the taverns owners: respondeat superior liability, and a direct claim of negligent hiring and supervision.

On the defendants' motion for summary judgment, the trial court held that the bouncer was not acting within the scope of his employment when he shot the plaintiff and, therefore, dismissed the plaintiff's respondeat superior claim. The trial court also determined that the dismissal of the respondeat superior claim also required dismissal of the plaintiff's direct claim of negligent hiring/negligent supervision. The court found that once the defendants were released from liability for their employee's acts, the remaining direct claims failed for lack of causation because there was nothing to link the actions of the defendants to the harm suffered by the plaintiff. Therefore, it granted defendants' motion for summary judgment.

The court of appeals reversed finding that an issue of material fact existed as to whether the bouncer had been acting within the scope of his employment when he shot the plaintiff. The appellate court also determined that the plaintiff's direct negligence claim was not dependent upon a finding of vicarious liability.

However, contrary to Plaintiff Isely's assertions, the *Sherrill* court did *not* adopt the tort of negligent supervision. Quite the contrary, the court specifically pointed out that "Wisconsin has neither adopted nor rejected the negligent hiring and negligent supervision torts." *Id.* The court continued, "Here, neither party briefed the issues relating to the validity of, or the elements of, these torts in this jurisdiction. Lacking this assistance, we decline to address them." *Id.*[19]

---

**19.** Plaintiff also relies upon *A.E. Investment Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 214 N.W.2d 764 (1974), and *Schuster v. Altenberg*, 144 Wis.2d 223, 424 N.W.2d 159 (1988), for the proposition that Wisconsin has recognized a cause of action for negligent supervision of an employee. Neither of these cases support Plaintiff's contention as neither of these cases involve an employer's negligent hiring or negligent supervision of an employee.

The *A.E. Investment* case involved an action brought by a building tenant against a contractor for negligent construction of the building in which the plaintiff had leased space. The only mention of "negligent supervision" in the case is in the court's summation of the plaintiff's complaint allegations:

It was alleged that the architect was negligent in its failure to adequately supervise construction, *in that it failed to determine the nature and condition of the subsoil prior to and during construction.* * * * It was alleged that as the direct and proximate result of the negligence, the floor space leased to the plaintiff began to settle, damage was caused to the walls, the floor became uneven, and eventually the premises became untenable.

214 N.W.2d at 765. Contrary to Plaintiff's assertions, no allegation was ever made that the contractor negligently supervised his employees and no claim was made that the contractor's negli-

While the Wisconsin state courts have clearly never expressly recognized the existence of a separate cause of action for negligent supervision, the Seventh Circuit, nonetheless, concluded in *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295 (7th Cir.1991), that the Wisconsin Supreme Court would recognize negligent supervision as a separate cognizable tort.

*Midwest* was a Federal Tort Claims Act action brought by a manufacturer against the Small Business Association. Midwest was a Milwaukee manufacturer of knitted goods. It was a subcontractor for several SBA contracts under a program which permitted capital-poor minority companies to receive advance payments needed to compete. Midwest had successfully completed several contracts prior to 1983.

In 1983, the SBA assigned the task of processing Midwest's applications for advance payments to one of its employees, Frederick Matthews. In 1984 and 1985, Midwest was awarded five contracts, the largest in excess of $1,250,000. Allegedly because of "dereliction, negligence, and deliberate sabotage" by Matthews, Midwest never received any advance payments. At the end 1985, Midwest was forced to surrender its contracts and go out of business.

According to Midwest, Matthews had a chemical dependency that resulted in "physical, intellectual and emotional infirmities." Midwest further alleged that Matthews' supervisors at the SBA retained him during this period even though they were aware of his poor performance.

Midwest sued the SBA for the amount of the contracts it had to cancel plus the value of future business lost as a result of its cessation of business under two theories: (1) the SBA's negligent supervision and retention of Matthews and (2) tortious interference by the SBA with its own contract with

Midwest. The parties agreed that Wisconsin substantive law would govern the action.

The district court held that Wisconsin courts would not recognize the tort of negligent supervision of an employee in this situation, nor would they recognize a claim for interference with one's own contract. Therefore, it granted the Government's motion to dismiss.

The Seventh Circuit affirmed, but for different reasons. The appellate court believed that the Wisconsin Supreme Court would recognize the tort of negligent supervision, but concluded that Wisconsin would decline to allow recovery in the case of Midwest because Midwest was alleging only a commercial loss and was seeking purely economic damages. 950 F.2d at 1300.

With respect to its determination that Wisconsin would recognize the tort of negligent supervision, the Seventh Circuit stated as follows:

> The tort of negligent supervision places liability upon a master for injuries inflicted on third persons by its servants when the master was guilty of selecting a servant incompetent or otherwise unfit to perform the services for which he was employed. 57 C.J.S. *Master and Servant*, S 559 (1948). As the parties correctly note, the Wisconsin Supreme Court has never explicitly recognized the existence of this tort by holding an employer liable for negligent retention or supervision of an employee. However, we have no reason to believe that Wisconsin would reject this cause of action if the matter were before its supreme court as a matter of first impression. The tort of negligent supervision of employees enjoys a secure position in the mainstream of American common law. The Restatements of both Torts and Agency recognize it, as does at least one of Wisconsin's neighbors. *See Ponticas v. K.M.S. Inv.*, 331 N.W.2d 907, 910 (Minn. 1983).[20] Professors Prosser and Keeton

gent supervision of his employees caused the damages suffered by A.E. Investment. Moreover, the precise issue in that case is whether a tenant, who had no privity of contract with the contractor, could sue for damages for negligent construction.

*Schuster v. Altenberg* is similarly inapplicable. That case involved a psychiatrist's duty to warn his patient and her family about the side effects of medication he had prescribed for Mrs. Schuester and of Mrs. Schuester's dangerous condition and its implications.

**20.** The *Ponticas* case actually dealt with the tort

write that a master "may, of course, be liable on the basis of any negligence of his own in selecting or dealing with the servant ... upon familiar principles of negligence and agency law."

Wisconsin cases have sustained causes of action analogous to the tort of negligent supervision of employees. In *Kamp v. Coxe Brothers & Co.*, 122 Wis. 206, 99 N.W. 366 (1904), the Wisconsin Supreme Court examined whether a wrongful death action could exist against an employer when an incompetent employee failed to warn a fellow employee of danger and that employee was killed.... While the facts, and to some extent, the policy concerns underlying the *Kamp* decision are analogous to this case, it is not controlling. The Wisconsin Supreme Court's holding is limited to interpreting an exception to the common law fellow-servant rule [which was abrogated and replaced by the workers' compensation acts]....

Later, Wisconsin cases have recognized claims arising from the failure to supervise adequately the work of an independent contractor [in the construction context].... Also, in the context of medical malpractice, the Wisconsin Supreme Court has held that a hospital has a duty to employ competent physicians. *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156, 170–171 (1981)....

950 F.2d at 1298–1299.

This Court is not convinced that Wisconsin *would* adopt negligent supervision as a distinct cause of action. First, to the extent that the *Midwest* court relies upon the fact that the Restatements and Prosser and Keeton recognize the tort, the Court notes that the Restatements are replete with causes of action that not all state courts recognize.

Second, as noted in footnote 20, contrary to the Seventh Circuit's assertion, Minnesota does not recognize a separate tort of negligent supervision, and, in fact, only a few jurisdictions do recognize it.[21]

Further, in all three Wisconsin cases cited by the *Midwest* court, the Wisconsin Supreme Court made it very clear that it was limiting its holding to the particular facts and circumstances of those cases and not stating a general principle of law.[22]

Finally, and perhaps most importantly, it is fundamental that when state law supplies the rule of decision, it is incumbent upon a federal court to determine how the highest court of the state would decide the case if it were presented to it. *Konradi v. United States,* 919 F.2d 1207, 1213 (7th Cir. 1990). The precise issue, as this Court sees it in this "delayed discovery" tort action, is not whether now—20 years after the occurrences upon which Plaintiff's claims are predicated—the Wisconsin Supreme Court would adopt the tort of negligent supervision, but rather whether, had the claim been presented to the Wisconsin Court in 1974–78, would the court have recognized it then? This is consistent with the generally accepted principle that a tort action is to be determined by application of the law which existed at the time of the occurrence of the events upon which the action is predicated. *See e.g., Duncan v. Steeper,* 17 Wis.2d 226, 116 N.W.2d 154 (1962) (court required to allow the defense of charitable immunity and the case accordingly dismissed because when the tort was committed, the charitable immunity defense was still recognized in Wisconsin).

This reflects this Court's concern, expressed *supra*, that it would be unfair to juxtapose contemporary mores and contemporary causes of action upon parties for

of negligent hiring, not negligent supervision. The court in that case merely noted in dicta that it saw "no substantial difference in imposing a duty on an employer to use reasonable care in the initial hiring from his duty to use that care in the retention of an employee." 331 N.W.2d at 911.

**21.** As observed in Am.Jur.2d. there is considerable disagreement among the states as to whether the negligence of an employer in selecting, re-

taining or supervising employees is an independent basis for the employer's liability to third-parties. See, 53 Am.Jur.2d, Master and Servant, § 422, p. 435, and cases cited therein. Contrary to the *Midwest* court's intimation, there are not that many jurisdictions which recognize this tort.

**22.** Moreover, the fellow-servant rule holding of the *Kamp* case has been abrogated and replaced by the workers' compensation act.

events which occurred in a different era with a different level of social awareness of problems. It is certainly not that this Court believes that Wisconsin courts would have tolerated or accepted without providing redress the type of conduct alleged by the Plaintiff to have been perpetrated upon him by the alleged abuser priests in question. (Indeed, both criminal and civil actions were clearly available to victims directly against those individuals.) Rather, the concern here is that the law did not then recognize a duty upon the *employer* to be responsible automatically for such *ultra vires* conduct of its employees. (This is different and distinct from any "duty to warn [about] and prevent" such conduct when an employer has advance notice, as the Court discusses, *infra.*)

 It is clear to the Court that in 1974–78, no cognizable cause of action for negligent supervision existed in Wisconsin, nor had there been as of that time any remotely similar causes of action decided by the Wisconsin appellate courts or the Wisconsin Supreme Court. Given the facts that (1) the tort of negligent supervision has even today yet to be recognized as an independent cause of action in Wisconsin and (2) the tort is not now, and certainly was not in 1974–78, universally accepted in other jurisdictions, this Court finds that if this case were presented to the Wisconsin Supreme Court 20 years ago, the separate and independent tort of negligent supervision would not be recognized.

For these reasons, the Court will dismiss Plaintiff's claims of negligent supervision.

### (c) *Failure to warn of and failure to prevent abuse*

While the tort of negligent supervision would present a novel theory of recovery for the Wisconsin Supreme Court, the Court does not find this to be the case with respect to Plaintiff's theory of "failure to warn/failure to prevent" the sexual abuse allegedly perpetrated upon him by Fathers Leifeld and Buser. This theory is generally recognized as a straightforward, black-letter common law negligence claim involving nothing more the duty imposed upon a reasonable person in

similar circumstances. As stated by Prosser and Keeton:

> The duty to take precautions against the negligence of others ... arises ... only where a reasonable person would recognize the existence of an unreasonable risk of harm to others through the intervention of such negligence....

> There is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely negligent; and this is all the more true where, as is usually the case, such acts are criminal. Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law....

> There are, however, other situations, in which either a special responsibility resting upon the defendant for the protection of the plaintiff, or an especial temptation and opportunity for criminal misconduct brought about by the defendant, will call upon him to take precautions against it. *The responsibility for protection ... may be founded upon some relation existing between the parties, such as ... school and pupil....*

*Prosser and Keeton on Torts* (5th ed.), § 33, pp. 199–203 (emphasis added.) *See also,* 57A Am.Jur.2d § 383, "A duty to warn may ... arise where a person stands in some special relationship to either a person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct." *Id.* at pp. 378–379.

 While the foregoing general principles demonstrate that a duty to warn/duty to protect may arise out of a school-pupil relationship, the treatises and case law makes clear that no duty can be imposed on a school to protect a student from intentional torts of a teacher simply because of their status as student and teacher. Rather, there must be evidence that the school's supervisory officials had knowledge of the activities of the teacher who was the subject of the complaints. *See, Kimpton v. School District of New Lisbon,* 138 Wis.2d 226, 405 N.W.2d 740 (Wisc.App.1987). *Cf., Hersh v. Kentfield, su-*

*pra* (holding that in order to find negligence on the part of an employer for failure to prevent the intentional or reckless acts of an employee, there must be sufficient evidence demonstrating that the employer knew or should have known of the employee's propensities to act in the complained of manner.)

In *Kimpton,* a high school student and his parents sued a school district alleging that the school district negligently allowed a sexual relationship to develop between the student and a teacher. Although the case involved both federal § 1983 and state common law negligence claims which were ultimately decided by application of the doctrine of governmental immunity, the court's explanation for finding insufficient evidence of a breach of duty to protect the student is instructive:

> To rise to the level of "gross negligence" ... the evidence must show that the district's supervisory officials knew or should have known that the employee was engaging in [illegal] conduct, and they failed to take remedial action. The deposition testimony of employees, supervisors and school board members reveals that none of them were in any way aware of Segerstrom's relationship with James until Segerstrom was arrested. Those facts are not disputed. James himself admitted that he took pains to conceal the relationship and told no one of it until December, 1983. There simply is no evidence that the district had any knowledge of the relationship.
>
> Nor is there any evidence indicating that the district should have known of Segerstrom's activities, or even the likelihood that they might occur. While school officials were aware that in the mid–1960's an unnamed male teacher was fired because of his sexual attraction to a male supervisor, this knowledge would not form any reasonable basis for the district to take preventative measures on the chance that Segerstrom might initiate a homosexual relationship with a student fifteen years later....
>
> The affidavits do suggest that school officials were aware of complaints about Segerstrom's disciplinary measures and that he previously had a drinking problem. But this knowledge alone would not rea-

sonably indicate to the school board that Segerstrom was likely to engage in a homosexual relationship with a student. It is undisputed that the school officials knew nothing of Segerstrom's activities, nor is there any basis for believing they should have known of them.... On these undisputed facts, the trial court properly granted summary judgment to the district.

405 N.W.2d at 746.

The failure to warn/failure to prevent issue has also come up in federal teacher/child sex abuse cases in Missouri. In *Thelma D. v. Board of Education, supra,* the plaintiffs attempted to hold a school district liable for failure to warn of an abusing teacher's sexual propensities and failure to prevent further abuse by him. With respect to the "knowledge" requirement, the plaintiffs sought to impute the knowledge of a teacher (not a supervisor) to the school district. The court expressly rejected the plaintiffs' argument, finding that non-abusing, non-supervisory school personnel had no common law duty to act upon their knowledge of a fellow teacher's sexual abuse of students. The court stated that, although a supervisory police officer might be liable for standing by and doing nothing while another police officer beat a third person in his presence because of the general responsibility of police officers to enforce the laws and keep the peace, there is no basis for holding school personnel similarly liable. The court explained:

> Plaintiffs ... contend that Soward, as a teacher, had a common law duty to act upon her alleged knowledge of Tansil's sexual abuse of plaintiffs and to report or prevent him from so abusing them....
>
> \* \* \* \* \* \*
>
> Teachers do have the responsibility for the care and welfare of their youthful charges.... But this obligation is not congruent with that of a police officer. Police officers, unlike teachers, are entrusted with the duty to enforce the laws. As stated in *Byrd [v. Brishke],* 466 F.2d 6 (7th Cir.1972) ], "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office...."

The Court finds Soward owed neither a statutory nor a common law duty to plaintiffs. Accordingly, her motion to dismiss is granted.

669 F.Supp. at 950–951.

It is undisputed that Paul Isely and St. Lawrence Seminary stood in a pupil-school relationship. The foregoing authorities make clear, then, that the issue in this case is whether evidence has been presented to demonstrate that any St. Lawrence Seminary or Capuchin Order administrators had notice of Leifeld's and/or Buser's sexual activities prior to their alleged abuse of Paul Isely.

Plaintiff Paul Isely, Defendant Kevin Hoelscher, and three of Plaintiff's witnesses—Peter Isely, David Grieber and Michael Albiero—testified regarding the reporting of the conduct of Jim Buser and Gale Leifeld.

### (1) *Failure to warn/failure to prevent Plaintiff's abuse by Jim Buser*

■ With respect to the conduct of Jim Buser, Plaintiff testified that he was sexually abused by Buser during his freshman year (i.e., in 1974–75). However, he admitted that he never reported Buser's alleged abuse of him to anyone at St. Lawrence during his stay at the seminary.

The only trial evidence of reports concerning Buser prior to his alleged abuse of Plaintiff was the testimony of Plaintiff's witness David Grieber.[23] Grieber testified that in 1971 he was sodomized by Jim Buser during a tutorial session which Buser conducted, and that after the incident, he stopped going to his tutoring sessions. He testified that a few days later, John Zickert, who at the time was the dean of freshman class, called him into his office to inquire why he was missing his tutorial sessions.

Grieber testified that he did not tell Father Zickert that he had been sodomized or molested or sexually abused by Buser. He only

told Zickert that Father Buser had "hurt" him and that Buser yelled at him, called him stupid, made him feel bad, and made him feel ashamed. [Grieber Dep. Tr. pp. 15–16; 33–34.] Grieber admitted that he never reported the incident to anyone else at St. Lawrence and he left the school at the end of the academic year.

Although Grieber testified that even though he never expressly told Zickert that Buser had sexually molested him, he thought Father Zickert understood that he was talking about being sexually abused. However, this is nothing more than conjecture on Grieber's part, and as indicated above, more than conjecture is required to warrant submitting an issue to the jury.

The court finds that Grieber's testimony of Father Buser having "hurt" him, having yelled at him, and having called him stupid is no different than the "notice" that the school district defendants in *Kimpton supra*, had of the conduct of the homosexual teacher in that case. In *Kimpton*, the only notice that school district had regarding the teacher in that case was that there had been complaints of his disciplinary tactics. Just as the *Kimpton* court determined with regard to the "notice" of complaints of disciplinary tactics, this Court finds that Grieber's report to told Father Zickert that Buser had hurt him, called him stupid and made him feel bad is insufficient evidence of notice of sexual abuse to warrant submitting to the jury Plaintiff's failure to warn/failure to prevent sexual abuse claims with respect to Plaintiff's alleged abuse by Jim Buser.

### (2) *Failure to warn/failure to prevent Plaintiff's abuse by Gale Leifeld*

■ With respect to the issue of St. Lawrence's knowledge of Gale Leifeld's conduct, Plaintiff testified that he reported Leifeld's conduct to Kevin Hoelscher, the athletic director, during his sophomore year (i.e., 1975–76). Isely testified that he told Hoelscher

**23.** Michael Albiero testified that he was abused by Jim Buser in late December of 1976 and that a week later he reported Buser's abuse of him to Father Leifeld, who at the time was the Rector of St. Lawrence. However, Albiero's alleged abuse and his report of the abuse to the Rector oc-

curred more than a year and a half *after* Paul Isely's alleged abuse by Buser. Therefore, Isely may not rely on Albiero's report to Leifeld as the basis for "notice" to the Seminary or the Order for purposes of his failure to warn/failure to prevent abuse claims.

about an incident with Leifeld in the movie projection booth when Leifeld massaged his neck, then ran his hand down his chest, down to his belt, at which point Isely "froze," and Leifeld stopped. According to Isely, Hoelscher told him that "he was going to get Father Gale some help". [Isely 2/13/95 Tr. p. 33.]

Kevin Hoelscher testified that he had no precise recollection of Paul Isely talking to him about his own abuse by Leifeld. [Hoelscher Dep. Tr, p. 56]. However, he did state that he had heard rumors about Leifeld massaging the necks of boys who worked with him in the projection booth. Hoelscher testified that he told Father Joe O'Conner, who was the Rector of St. Lawrence until December of 1976, what he had heard. However, precisely when Hoelscher reported this the Rector is unclear.

Isely also testified about another incident of abuse by Leifeld which occurred in the Rector's office. This incident also involved his brother, Peter. Plaintiff testified that this incident also occurred during his sophomore year (i.e., 1975–76). According to the testimony of Peter Isely, the incident occurred in April of 1976. However, it is unclear from Plaintiff's testimony whether this incident occurred before or after the projection booth massaging incident. And, as indicated above, the timing of Hoelscher's report of rumors to the Rector, Father O'Conner, is also unclear.

Plaintiff also testified that he reported Leifeld to Hoelscher a second time, during his junior year (i.e., 1976–77). Isley stated that he went to Hoelscher to report that he had heard from another student that Tom Schmidt, who was also a student at St. Lawrence, was abused by Leifeld. Hoelscher first testified that he *also* reported the Schmidt incident to Father O'Conner, the Rector, but then he later testified that he believed that it was the only incident that he went to Father O'Conner about. [See Hoelscher Dep. Tr. pp. 41–54.]

Although the testimony is unclear and may be contradictory, the Court cannot say that Plaintiff has presented no evidence of prior notice to St. Lawrence administrators. There is evidence of at least one report, and perhaps two reports, made by Hoelscher to Father O'Conner sometime during 1976. Whether the report (or reports) was/were made *before* or after the incident involving Paul and Peter Isely and Leifeld in the Rector's office is an issue of fact that the jury will have to decide.

For these reasons, Defendants motion for summary judgment as a matter of law with respect to the claims against Hoelscher, St. Lawrence Seminary, and the Capuchin Province for failure to warn/failure to prevent Plaintiff's abuse by Gale Leifeld will be denied.[24] However, with respect to Defendants Myron Kowalsky and Lloyd Thiel, inasmuch as Plaintiff has admitted that he has no evidence that either of these Defendants had any notice of the alleged abusive conduct of Leifeld or Buser, the motion will be granted. Therefore, Counts VII and VIII (i.e., the claims against Fathers Thiel and Kowalsky) will be dismissed in their entirety. Thus, with respect to the non-abuser Defendants, this leaves only Plaintiff's "failure to warn/failure to prevent" in Counts IV, VI, and XVI to go to the jury.[25]

24. With respect to the Capuchin Province, there was trial testimony from Defendants' own witnesses that the Rector of St. Lawrence was appointed by, and is responsible to, the Provincial Council. As such, the Rector is, effectively, the Provincial Council's acting agent in charge of the school. Father Reinhart, who at one time was the Provincial head, testified that he would have expected that the Rector, upon receiving a report of suspected abuse, would report the abuse to him. He also testified that the Provincial Council can remove a priest from his post if he is found guilty of abuse. The Court finds that these facts are sufficient evidence from which the jury may infer liability on the part of the Province for failure to prevent abuse.

25. With respect to any "duty to warn/duty to prevent" claims arising out of Father Jim Wolf's actions at the Pre–Novitiate Program in Detroit, it is undisputed that there was never any advance notice given to anyone concerning those alleged acts, and consequently such claims must also be dismissed.

Further, for the reasons stated by the Court on the record on March 15, 1995, Plaintiff's may not submit for the jury's consideration any claim for damages arising out of the projection booth "touching" incident. This claim is time-barred as Plaintiff has admitted all along that he always remembered this incident.

## E. *PUNITIVE DAMAGES*

The non-abusing Defendants also ask that the Court dismiss all allegations of punitive damages as to them.

Whether there is sufficient evidence to submit the question of punitive damages to the jury is a question of law to be decided by the court. *Loveridge v. Chartier*, 161 Wis.2d 150, 468 N.W.2d 146, 158 (1991).

In Wisconsin, the remedy of punitive damages is only available when the defendant acts in wanton, willful, or reckless disregard of the plaintiff's rights or interests. *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (1985). Conduct that justifies punitive damages is generally of two distinct types:

the first type is that in which the defendant desires to cause the harm sustained by the plaintiff, or believes that the harm is substantially certain to follow his conduct. With the second type of conduct the defendant knows, or should have reason to know, not only that his conduct creates an unreasonable risk or harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result, but, nevertheless, he proceeds with his conduct in reckless or conscious disregard of the consequences. Neither form of conduct, therefore, involves mere inadvertence or what, in the traditional tort sense, would be called ordinary negligence.

*Loveridge, supra,* 468 N.W.2d at 158.

Wisconsin courts often use the short-hand term "outrageous" for the type of conduct which justifies the imposition of punitive damages. *Maxey, supra; Loveridge, supra.* This "outrageous" conduct must be proven by *clear and convincing evidence. Maxey, supra.* However, the fact that the conduct on which the suit is based is unlawful and would subject the defendant to criminal prosecution is *not* itself sufficient to impose punitive damages. *Fahrenberg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516 (1980).

Given the "clear and convincing" evidentiary standard which governs the punitive damages, the Court finds that the evidence presented is not sufficient to warrant submitting the punitive damages claims to the jury. As indicated above, although there is *some* evidence of "notice" having been provided to St. Lawrence administration prior to Plaintiff's alleged abuse by Defendant Leifeld, that evidence is far from clear and convincing. The best that can be said is that the evidence presented is contradictory. Without clear and convincing evidence of prior notice there can be no inference that St. Lawrence acted in reckless disregard of Plaintiff's rights in failing to prevent his abuse.

Therefore, the Court will grant the non-abuser Defendants motion for judgment as a matter of law on the issue of punitive damages. Accordingly, Plaintiff's claims for punitive damages against the non-abuser Defendants will not be submitted to the jury.[26]

## F. *DEFENDANT JIM WOLF'S MOTION FOR "DIRECTED VERDICT"*

Defendant Jim Wolf has separately moved for entry of a directed verdict in his favor. As discussed above in this Opinion and Order, this defendant's argument is that Plaintiff has not presented sufficient evidence to warrant submitted the case against him to the jury because he has not presented sufficient evidence to establish that the alleged sexual abuse by Jim Wolf occurred or that Plaintiff could not have discovered the alleged abuse less than three years before he filed this lawsuit. With respect to this latter issue, Defendant Jim Wolf argues that the testimony of Plaintiff's psychological experts is insufficient to allow a reasonable juror to conclude that the repressed memory theory is scientifically valid, and therefore, a directed verdict on this basis alone is required.

Both of the issues raised by Defendant Jim Wolf have been already ruled upon by the Court in its Opinion and Order denying the Defendants' Motions for Summary Judgment and in its Opinion and Order Regarding Defendants' Motions *in Limine* to Preclude or Limit the Testimony of Plaintiff's Psychologi-

**26.** This ruling does not affect Plaintiff's claim for punitive damages against Defendant Leifeld. (With respect to Plaintiff's intentional tort claims against Defendant Jim Wolf, those claims are governed by Michigan law, and Michigan does not allow punitive damages.)

**1160**

cal Experts and the Court incorporates those rulings by reference in this Opinion and Order.

For the reasons set forth in the Court prior rulings on the issues of statute of limitations and psychological expert testimony, Defendant Jim Wolf's "Motion for Directed Verdict" will be denied.

However, as noted *supra*, even if an issue is not raised in a Rule 50 motion, the Court may, nonetheless, *sua sponte* enter a Judgment as a Matter of Law. The Court finds that in this case, such a *sua sponte* decision is warranted with respect to some of the claims alleged by Plaintiff against the two accused abuser Defendants, Jim Wolf and Gale Leifeld.

As discussed above in this Opinion and Order, Plaintiff has asserted three separate causes of action against each of these two individuals: "intentional misconduct" (Counts I and IX); "common law negligence" (Counts II and X); and "professional negligence" (Counts III and XI). The Court finds that Plaintiff's common law negligence and "professional negligence" claims against the two accused abusers must be dismissed.

■ First with respect to Plaintiff's claims of "professional negligence", these claims are essentially claims of "clergy malpractice". There is, however, no statutory or case law to establish that Wisconsin recognizes a claim for "clergy malpractice". Michigan does not. *Dlaikan v. Roodbeen*, 206 Mich.App. 591, 522 N.W.2d 719 (1994), Neither does Illinois. *See, Dausch v. Rykse*, 52 F.3d 1425 (7th Cir.1994) (applying Illinois law). *See also, Schmidt v. Bishop*, 779 F.Supp. 321 (S.D.N.Y.1991).

■ With respect to Plaintiff's "common law negligence" claims against Leifeld and Jim Wolf, although the Plaintiff was certainly permitted to plead, in the alternative, claims

of negligence and intentional conduct in his Complaint, pursuit at trial of such intentional tort/negligence "double" claims is impermissible. As the court explained in *Schmidt v. Bishop, supra,*

> Once intentional offensive contact has been established, the actor is liable for assault not negligence.... It is thus, legally impossible to claim that the alleged perpetration of deliberate abuse injured the plaintiff negligently.

*Id.* at 325.

For the foregoing reasons, the Court will dismiss Plaintiff's claims of common law and professional negligence against Defendants Jim Wolf and Gale Leifeld. Only the "intentional conduct" claims against these accused abusers will be submitted to the jury.[27]

## *CONCLUSION*

For the reasons stated in this Opinion and Order and for the further reasons stated by the Court on the record on March 15, 1995,

IT IS HEREBY ORDERED that the non-abuser Defendants' Motion for Judgment as a Matter of Law is GRANTED, in part, as follows:

(1) Defendants' Motion is granted as to all of Plaintiff's breach of contract claims, all of his claims against Defendants Werner Wolf, Ron Smith, Lloyd Thiel, Myron Kowalsky, and the Detroit Pre–Novitiate Program. Accordingly, Counts V, VII, VIII, XII, XIII, XIV, XV, and XVII are hereby DISMISSED in their entirety.

(2) Defendants' Motion is also granted as to Plaintiff's claims of statutory negligence, negligent hiring, negligent retention, negligent supervision, and failure to have a sex abuse policy in place as alleged against Defendants Kevin Hoelscher, St. Lawrence Seminary, and the Capuchin Province in Counts IV, VI, and XVI.

27. With respect to Plaintiff's "agency" theory of direct liability of St. Lawrence and the Capuchin Province for the actions of Leifeld, Buser and Wolf, Plaintiff predicates this theory upon Section 219(2)(d) of the Restatement (Second) of Agency which permits the imposition of liability upon an employer for the torts of his employee acting outside the scope of his employment when

it is established that the employee "was aided in accomplishing the tort by the existence of the agency relationship". However, as Plaintiff admits at p. 27 of his Answer to Defendants' Motion for Judgment as a Matter of Law, the doctrine of Section 219(2)(d) has never been applied to priest/parishioner relationships, and this Court declines to do so in this case.

(3) Defendants' Motion is also GRANTED as to plaintiff's claims of failure to warn and failure to prevent his abuse by Jim Buser, but as to his allegations of failure to warn and failure to prevent his abuse by Gale Leifeld, Defendants' Motion is DENIED. Accordingly, the Leifeld failure to warn/failure to prevent allegations in Counts IV, VI and XVI will be submitted to the jury.

(4) Defendants' Motion is also granted as to Plaintiff's claims of punitive damages. Accordingly, no punitive damages claims with respect to the conduct of the non-abuser Defendants will be submitted to the jury. The only punitive damages claims that may be submitted to the jury are claims arising out of the actions of individual Defendant Gale Leifeld.

IT IS FURTHER ORDERED that Defendant Jim Wolf's separately filed "Motion for Directed Verdict" is hereby, DENIED.

IT IS FURTHER ORDERED that Plaintiff's claims of common law negligence and professional negligence alleged against the two accused abuser Defendants, Jim Wolf and Gale Leifeld, in Counts II, III, X, and XI are DISMISSED in their entirety with prejudice.