**Theresa M. ZEIGLER, Plaintiff,**

v.

**FISHER–PRICE, INC., Defendant.**

**No. C01–3089–PAZ.**

United States District Court,
N.D. Iowa,
Central Division.

Jan. 8, 2004.

Stephen F. Avery, Cornwall, Avery, Bjornstad, Scott, Spencer, IA, for plaintiff.

Cheryl Possenti, Goldberg, Segalla, LLP, Buffalo, NY, Kevin M. Reynolds, Whitfield & Eddy, PLC, Des Moines, IA, for defendant.

## ORDER ON POST–TRIAL MOTIONS

ZOSS, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1003

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1003

III. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1004
    A.   Motion for Judgment as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . 1004
        1.   Design defect and breach of warranty claims . . . . . . . . . . . . . . . . . . . . 1006
        2.   Punitive damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1009
    B.   Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1010
        1.   Rulings on testimony of James Finneran . . . . . . . . . . . . . . . . . . . . . . 1011

2. *Ruling on admissibility of press release* ..........................1020
3. *Ruling on testimony of Bruce Wandell* ...........................1022
4. *Rule 50(c) analysis* ...........................................1022

**V. CONCLUSION** ...............................................1022

## I. INTRODUCTION

This case arises out of a house fire that occurred on June 1, 2001, in Estherville, Iowa. The plaintiff Theresa Zeigler ("Zeigler") alleges the fire was caused by a defect in a toy vehicle sold by the defendant Fisher–Price, Inc. ("Fisher–Price"). Fisher–Price denies the allegation.

The dispute was tried to a jury beginning on July 7, 2003. At the close of Zeigler's case, Fisher–Price moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The court reserved ruling on the motion, and directed Fisher-price to proceed with its case. At the close of the evidence, Fisher–Price renewed its motion, and the court again reserved ruling and submitted the case to the jury. On July 10, 2003, the jury returned a verdict finding for Zeigler on two theories of recovery (design defect and breach of implied warranty of merchantability), and for Fisher–Price on a third theory of recovery (negligent failure to warn). The jury awarded the plaintiff $195,217.95 in actual damages and $1,000,000 in punitive damages. Judgment in these amounts was entered on July 11, 2003.

On July 24, 2003, Fisher–Price timely renewed its motion for judgment as a matter of law pursuant to Rule 50(b), and also filed a motion for new trial. Fisher–Price requested oral argument on both motions. (Doc. Nos. 138 & 136, respectively) Zeigler resisted the motions on August 1, 2003. (Doc. Nos. 140 & 139, respectively) On August 7, 2003, Fisher–Price filed a reply to Zeigler's resistance to the motion for new trial (Doc. No. 141), and on August 11, 2003, Fisher–Price filed an additional reply on one issue raised in its motion for new trial (Doc. No. 142).

These motions are now fully submitted. Because the issues presented in the post-trial motions have been well briefed, and the court does not believe oral argument would be of assistance to the court, the requests for oral argument are denied. The court now is prepared to address the issues raised by Fisher–Price in its motions.[1]

## II. BACKGROUND

Before 1994, "Power Wheels" toy vehicles were manufactured and sold by Kransco, Inc. In 1994, Mattel, Inc., the parent corporation of Fisher–Price, purchased the Power Wheels product line from Kransco. After the purchase, Fisher–Price began selling Power Wheels toy vehicles, and since then, the product line has accounted for a large part of Fisher–Price's revenues and profits.

In 1997, the grandparents of Madisen Zeigler, the plaintiff Zeigler's young

---

1. Fisher–Price also filed a motion for entry of an order *nunc pro tunc* to correct the caption of this case to list Theresa Zeigler as the sole plaintiff, deleting the following language from the caption: "individually; and THERESA M. ZEIGLER, as mother and next friend of MADISEN ZEIGLER." (Doc. No. 137) While the evidence in the case chiefly concerned the claims of Theresa Zeigler, the court was under the impression that some part of the property damage claim in the case related to property belonging to Theresa Zeigler's minor daughter, Madisen. However, Fisher–Price states in the motion that counsel for Zeigler does not resist the motion, and no resistance has been filed. Accordingly, the motion is **granted.** *See* LR 7.1(f) ("If no timely resistance to a motion is filed, the motion may be granted without prior notice from the court.")

daughter, gave Madisen a "Power Wheels Barbie Sun Jammer Jeep" for Christmas. At the trial of this case, Zeigler testified that shortly after Christmas, she mailed a warranty card for the toy vehicle to Fisher–Price.

In October 1998, after negotiations with the U.S. Consumer Product Safety Commission ("CPSC"), Fisher–Price instituted a recall of Power Wheels toy vehicles, in part because of allegations that the toys overheated and caused fires. Fisher–Price's witnesses testified at trial that Fisher–Price provided notice of the recall to everyone known to have purchased Power Wheels toy vehicles from Fisher–Price, including everyone from whom the company had received a warranty card. Fisher–Price also used a number of other avenues to notify the public of the recall, including advertising and the posting of notices at toy stores and pediatricians' offices. Zeigler testified she did not learn of the recall until after June 1, 2001, when her house and garage in Estherville, Iowa, were destroyed by fire.

At the time of the fire, Madisen's toy vehicle was parked in the garage attached to Zeigler's house. Zeigler claims the toy vehicle caused the fire. At trial, she proceeded on three theories of recovery: design defect, breach of the implied warranty of merchantability, and negligent failure to warn. Fisher Price offered evidence to prove both that the cause of the fire could not be determined, and that Madisen's Power Wheels toy vehicle could not have caused the fire.

The jury found for Fisher–Price on Zeigler's failure to warn claim, and for Zeigler on her design defect and breach of warranty claims. The jury awarded Zeigler actual damages of $195,217.95, and punitive damages on her design defect claim of $1,000,000.

## III.  LEGAL ANALYSIS

### A.  Motion for Judgment as a Matter of Law

The standards for a motion for judgment as a matter of law recently were summarized by the Chief Judge of this district, the Honorable Mark W. Bennett, in *Knutson v. Ag Processing, Inc.*, 273 F.Supp.2d 961 (N.D.Iowa 2003), as follows:

The standards for a motion for judgment as a matter of law are outlined in Rule 50 of the Federal Rules of Civil Procedure. In pertinent part, Rule 50 provides:

(a) Judgment as a Matter of Law.

(1) If during the trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to jury subject to the court's later deciding the legal questions raised by the motion.

The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; or

(2) if no verdict was returned;

(A) order a new trial, or

(B) direct entry of judgment as a matter of law.

Fed.R.Civ.P. 50(a)-(b).

"Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Manus v. American Airlines, Inc.*, 314 F.3d 968, 972 (8th Cir.2003) (quoting *Belk v. City of Eldon*, 228 F.3d 872, 877–78 (8th Cir. 2000) (citation omitted by *Manus* court), *cert. denied*, 532 U.S. 1008, 121 S.Ct. 1734, 149 L.Ed.2d 659 (2001)). The Eighth Circuit Court of Appeals reiterated the standards to be applied by the district court—as well as the appellate court—in determining a motion for judgment as a matter of law:

> When the motion seeks judgment on the ground of insufficiency of the evidence, the question is a legal one. *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir.1997); *Jarvis v. Sauer Sundstrand Co.*, 116 F.3d 321, 324 (8th Cir.1997). A jury verdict must be affirmed "'unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party.'" *Stockmen's Livestock Mkt., Inc. [v. Norwest Bank*

*of Sioux City]*, 135 F.3d 1236, 1240–41 (8th Cir.1998) (quoting *Chicago Title Ins. Co. v. Resolution Trust Corp.*, 53 F.3d 899, 904 (8th Cir.1995)).

*Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir.1998); *accord Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.") (citations omitted). Thus, this standard requires the court to:

> "[C]onsider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Associates*, 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989)); *see also Stephens v. Johnson*, 83 F.3d 198, 200 (8th Cir.1996) (citing *Whitnack v. Douglas County*, 16 F.3d 954, 956 (8th Cir.1994), in turn, quoting *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 509 (8th Cir. 1992)); *Haynes v. Bee–Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir.1996); *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir.1994) (reiterating these factors, citing *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992)); *McA-*

*nally v. Gildersleeve,* 16 F.3d 1493, 1500 (8th Cir.1994) (same).

In short, a court entertaining a motion for judgment as a matter of law must review all of the evidence in the record but, in doing so, "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150[, 120 S.Ct. 2097] (citing *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696 n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). This standard for consideration of a motion for judgment as a matter of law accords the jury's verdict substantial deference. *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir.1994); *McAnally,* 16 F.3d at 1500. However, even with this deference to the jury's verdict, the jury cannot be accorded "the benefit of unreasonable inferences, or those 'at war with the undisputed facts,'" *McAnally,* 16 F.3d at 1500 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha,* 883 F.2d 650, 651 (8th Cir.1989), in turn, quoting *Marcoux v. Van Wyk,* 572 F.2d 651, 653 (8th Cir.1978)). "While [the court] [is] compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [the court] [is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdict if the evidence cannot support it.'" *Ocheltree v. Scollon Productions, Inc.,* 308 F.3d 351, 355 (4th Cir.2002) (quoting *Price v. City of Charlotte, N.C.,* 93 F.3d 1241, 1250 (4th Cir.1996) (internal citations omitted)), *rehearing en banc granted, opinion vacated on other grounds* (Dec. 16, 2002).

Nevertheless, the court must still defer to the jury's resolution of conflicting testimony. *Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Knutson,* 273 F.Supp.2d at 981–82.

Fisher–Price argues it is entitled to judgement as a matter of law on three bases. Firstly, Fisher–Price seeks judgment on Zeigler's design defect claim on the basis that the evidence did not support a plaintiff's verdict on this claim. In particular, Fisher–Price argues the absence of expert testimony to support the claim is fatal. Fisher–Price also argues that in submitting the design defect claim to the jury, the court established "an impermissible legal duty under Iowa law to 'retrofit' or 'recall' a product." (Doc. No. 138, p. 12) Secondly, Fisher–Price argues it is entitled to judgment as a matter of law on Zeigler's claim for breach of the implied warranty of merchantability because the court erred in submitting both the design defect claim and the breach of warranty claim to the jury. Thirdly, Fisher–Price argues it is entitled to judgment as a matter of law on the plaintiff's claim for punitive damages because punitive damages are not warranted under the facts and applicable law. The court will address each of these arguments.

**1. *Design defect and breach of warranty claims***

Fisher–Price argues the design defect judgment should be reversed on two grounds. (*See* Doc. No. 138–1, pp. 10–14) Fisher–Price also argues the court erred when it instructed the jury on both design defect and breach of the implied warranty of merchantability, and therefore the breach of warranty judgment also should be reversed. (*Id.,* pp. 14–15)

Addressing first Fisher–Price's claim that the design defect claim should be reversed, the court has reviewed carefully

the record made by Fisher–Price in support of its Rule 50(a) motion at the close of the plaintiff's evidence at trial. (*See* Fisher–Price App., pp. 599–606) Nowhere in the record does Fisher–Price ask for judgment as a matter of law on Zeigler's design defect claim, or cite any factual or legal argument to support such a motion. Rather, Fisher–Price took the express position that Zeigler's claim was a design defect claim, and Fisher–Price argued the breach of warranty claim should not be submitted to the jury *along with* the design defect claim due to the possibility of inconsistent verdicts on what essentially were identical claims, and the unfair advantage presented by giving the plaintiff "two bites at the same apple." (*Id.*, pp. 605–06)

■ The Eighth Circuit Court of Appeals has held:

> A party is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its Rule 50(b) motion after trial if the Rule 50(a) motion proves unsuccessful. *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995). Thus, a Rule 50(a) motion is a prerequisite to a Rule 50(b) motion because the party must apprise the district court of the alleged insufficiency of the plaintiff's suit before the case is submitted to the jury.

*Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir. 1998). Although the grounds for a Rule 50(a) motion do not have to be stated "with technical precision," the party asserting the motion must, at the very least, give fair notice to the court of the grounds for the motion. *Id.* This was not done here.

■ Rule 50(a)(2) specifies that a party's motion must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.P. 50(a)(2). *See* Wright & Miller, Fed. Prac. & Proc., Fed.R.Civ.P., § 2533. Because Fisher–Price did not assert, in its Rule 50(a) motion at the close of the plaintiff's case, any grounds for a judgment as a matter of law on the design defect claim, it cannot do so now in a Rule 50(b) motion.

■ Nevertheless, in an appropriate case, the court has the power to grant judgment as a matter of law *sua sponte*, even when no proper Rule 50(a) motion has been made. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 559 (5th Cir. 2001) (nothing in Rule 50 forbids a court from granting judgment as matter of law *sua sponte* ); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir.1999) (default in making Rule 50(a) motion may be overlooked in order to "prevent a manifest injustice in cases where a jury's verdict is wholly without legal support"— internal quotation marks and citations omitted); *Isely v. Capuchin Province*, 880 F.Supp. 1138, 1144 (E.D.Mich.1995) ("[I]t is well-settled that the district court also has the power to grant [judgment as a matter of law] *sua sponte*, even when no motion is made.") (citing *Safeway Stores v. Fannan*, 308 F.2d 94, 99 (9th Cir.1962); *Peterson v. Peterson*, 400 F.2d 336, 343 (8th Cir.1968)); Wright & Miller, *supra.*[2] The court's discretion to enter judgment as a matter of law *sua sponte* supports the principle that a trial court should have "an opportunity, after all [its] rulings have been made and all the evidence has been evaluated, to view the proceedings in a perspective peculiarly available

---

**2.** The power is discretionary, however, as "[a]bsent a proper motion, a district court is not compelled to rule." *Farmland Indus., Inc. v. Morrison–Quirk Grain Corp.*, 54 F.3d 478, 483 (8th Cir.1995).

to [the trial court] alone. [The court] is thus afforded 'a last chance to correct [its] own errors without delay, expense, or other hardships of an appeal.'" *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947) (quoting *Greer v. Carpenter*, 323 Mo.. 878, 19 S.W.2d 1046, 1047 (1929)).

The court has reviewed these legal principles here because, as discussed further below, the court finds judgment as a matter of law is appropriate on Zeigler's design defect claim.

As noted, Fisher–Price argues it was improper for the court to submit both the design defect claim and the breach of warranty claim to the jury. This conclusion is correct, but not for the reasons urged by Fisher–Price. Fisher–Price argues Zeigler's claim "should be governed exclusively by Section 2(b) of the Restatement Third of Torts, Products Liability, consistent with *Wright v. Brooke Group*, 652 N.W.2d 159 (Iowa 2002)." (Doc. No. 138–1, p. 14) Fisher–Price goes on to characterize Zeigler's claim as a tort claim that falls outside the Uniform Commercial Code's warranty provisions. Fisher–Price argues that because the *Wright* court expressly adopted Section 2 of the Restatement Third, a warranty action is inappropriate on the facts of this case. The court disagrees with Fisher–Price's interpretation of Iowa law.

■■■ Fisher–Price correctly notes Official Comment *n* to Section 2 instructs that a plaintiff should not be permitted to submit a case based on both strict liability (*e.g.*, design defect) and implied warranty of merchantability theories because the theories are duplicative. However, this does not mean, as Fisher–Price claims, that an action for breach of the implied warranty of merchantability is not appropriate at all—only that, absent personal injury, the warranty claim should not be brought together with a design defect claim arising on the same facts. As the Reporter's Notes to Official Comment *n* point out, when a plaintiff establishes the existence of a design defect under Section 2, "courts are free to utilize the concepts of negligence, strict liability, *or implied warranty of merchantability* as theories of liability." (Emphasis added.) The jury in this case found that a design defect, in fact, existed in Madisen Zeigler's Power Wheels toy. That prerequisite having been met, Zeigler was free to proceed on her breach of warranty claim.

■■■ In this diversity case, the determination as to which theories of liability on Zeigler's claims properly could be submitted to the jury is governed by Iowa law. *See Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir.1994) ("A federal court sitting in diversity applies the substantive law ... of the forum state.") Iowa law "distinguishe[s] product claims premised on tort theories from product claims grounded on warranty theories on the basis of the damage sought rather than on the basis of the nature of the wrongful conduct." *Wright*, 652 N.W.2d at 181. The Iowa Supreme Court has "limited cases involving only economic loss to *warranty theories*," while permitting personal injury plaintiffs "to seek recovery under tort and warranty theories that in essence allege the same wrongful acts." *Id.* (emphasis added).[3]

---

**3.** The fire in this case obviously relates to an alleged "safety hazard," which the Iowa Supreme Court has held should be redressed through a tort action rather than a breach of warranty action. *See American Fire & Casualty Co. v. Ford Motor Co.*, 588 N.W.2d 437, 439 (Iowa 1999) ("[D]efects of suitability and quality are redressed through contract actions and safety hazards through tort actions." Internal quotation marks and citations omitted.). Yet the Iowa court also holds a tort action is only appropriate in a case involving personal injury, *see Wright*, which appears to omit completely a case involving an alleged

Well before trial in this case, the court granted Fisher–Price's motion to dismiss Zeigler's emotional distress claim, removing from the case any claim for personal injury, and leaving only a claim for economic loss related to the fire. Thus, under Iowa law, it appears the *only* appropriate claim to submit to the jury, relating to the Power Wheels toy itself, was the claim for breach of the implied warranty of merchantability.

For these reasons, the court finds it was error to submit the design defect claim to the jury, but it was appropriate to submit the claim for breach of the implied warrant of merchantability. Accordingly, the court **denies** Fisher–Price's motion for judgment as a matter of law on *both* the design defect and breach of warranty claims, but nevertheless **enters judgment as a matter of law** on the design defect claim, *sua sponte.*

### 2. *Punitive damages claim*

■ Fisher–Price argues the punitive damages judgment in this case should be reversed. Given the court's entry of judgment as a matter of law on Zeigler's design defect claim, and the jury's verdict in favor of Fisher–Price on Zeigler's failure to warn claim, the court agrees. Final Instruction No. 11 instructed the jury that in order to award punitive damages, Zeigler first had to prove her design defect claim or her negligent failure to warn claim. Absent a favorable judgment on either of these tort theories, punitive damages are not available. Therefore, Fisher–Price's motion for judgment as a matter of law on the punitive damages claim is **granted,** and the punitive damages judgment is **reversed.**

■ However, even if the design defect judgment remained undisturbed, the court

nevertheless would grant Fisher–Price's motion to strike the punitive damages award.

■ Chief Judge Bennett has explained the requirements to sustain a claim for punitive damages under Iowa law, as follows:

> Under Iowa law, the decision of whether to award punitive damages and the scope of the damages are within the province of the finder of fact. The evidence to support an award must be clear, convincing and satisfactory. *See* Iowa Code § 668A.1(1)(a); *accord Revere Transducers Inc. v. Deere & Co.,* 595 N.W.2d 751, 771 (Iowa 1999); *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 142 (Iowa 1996). Conduct that establishes a "willful and wanton disregard for the rights or safety of another" will support an award of punitive damages. *Wilson,* 558 N.W.2d at 142. The Iowa Supreme Court has approved the following definition of "willful and wanton" conduct for section 668A.1(1) purposes: "[T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990) (quoting Prosser and Keeton on Torts § 34, at 213 (1984)); *accord Midwest Home Distrib. v. Domco Indus.,* 585 N.W.2d 735, 743 (Iowa 1998).

*Asa–Brandt, Inc.,* 2002 WL 1714197, *5. Under Iowa law, punitive damages are appropriate only when the plaintiff proves the defendant acted with actual or legal malice; conduct that is merely negligent is not sufficient to support a claim for puni-

---

safety hazard where the only damage is to property. The court has decided the present

issues on the basis of existing Iowa law as set forth in the more recent *Wright* case.

tive damages. *Mercer v. Pittway*, 616 N.W.2d 602, 617 (Iowa 2000) (citing *Schultz v. Security Nat'l Bank*, 583 N.W.2d 886, 888 (Iowa 1998); *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 256 (Iowa 1993)). *See State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003) (punitive damages "are aimed at deterrence and retribution").

Here, considering the evidence in the light most favorable to Zeigler, there is insufficient evidence of willful or wanton conduct by Fisher–Price to justify punitive damages. Although there is evidence Fisher–Price was aware of overheating and fires occurring in connection with Power Wheels vehicles, this evidence does not establish that Fisher–Price knew the problems were caused by a design defect. In fact, the evidence strongly suggests Fisher–Price believed most, if not all, of these problems arose from consumer misuse or abuse of the product. The record does not support a finding that Fisher–Price was aware of the design problem alleged in this case, and willfully and wantonly ignored the problem. Because the record does not contain clear, convincing, and satisfactory evidence to support a finding of willful and wanton conduct on the part of Fisher–Price, its motion for judgment as a matter of law on Zeigler's punitive damages claim would be granted in any event.

### B. Motion for New Trial

Federal Rule of Civil Procedure 59, entitled "New Trials; Amendment of Judgments," provides, in relevant part, as follows: "A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the

courts in the United States ...." Fed. R.Civ.P. 59(a).

In *Asa–Brandt, Inc. v. Farmers Co–Operative Society*, 2002 WL 1714197 (N.D.Iowa, May 10, 2002), Chief Judge Bennett explained as follows regarding the requirements to prevail on a motion for new trial:

Regarding motions for new trial under Federal Rule of Civil Procedure 59, the Eighth Circuit Court of Appeals has observed:

With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir.1984) (*citation omitted*). Similar language appears in *Brown [v. Syntex Lab., Inc.*, 755 F.2d 668], 671–73 [(8th Cir.1985)]; *Slatton [v. Martin K. Eby Constr. Co.]*, 506 F.2d [505], 508 n. 4 [(8th Cir.1974), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975)]; *Bates [v. Hensley]*, 414 F.2d [1006], 1011 [(8th Cir.1969)], and early authority cited in *Bates*. *See also Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1266 (8th Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). These cases establish the fundamental process or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for [judgment notwithstanding the verdict].

White v. Pence, 961 F.2d 776, 780 (8th Cir.1992). Thus, the Eighth Circuit Court of Appeals concluded in *Pence* that the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a miscarriage of justice. *Id.; see also Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir.2000) (stating that a motion for new trial should only be granted if the jury's verdict was against the great weight of the evidence so as to constitute a miscarriage of justice) (citation omitted); *Shaffer v. Wilkes*, 65 F.3d 115, 117 (8th Cir.1995) (citing *Pence*); *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir.1994) (stating "[a] motion for new trial should be granted if, after weighing the evidence, a district court concludes that the jury's verdict amounts to a miscarriage of justice."); *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir.) (observing that the correct standard for new trial is the conclusion that "the [jury's] verdict was against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice."), *cert. denied*, 513 U.S. 989, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994).

*Asa–Brandt, Inc.*, 2002 WL 1714197, at *7–*8.

■ To the extent Fisher–Price's Rule 59 motion centers on the court's evidentiary rulings, the governing standard is whether the allegedly erroneous evidentiary ruling "was so prejudicial that a new trial would likely produce a different result." *See Baker v. John Morrell & Co.*, 249 F.Supp.2d 1138, 1177 (N.D.Iowa 2003) (citing *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 612 (8th Cir.1997)). The court, therefore, will examine its evidentiary rulings during the trial.

### 1. Rulings on testimony of James Finneran

■ Fisher–Price argues the court abused its discretion when it granted, in part, Zeigler's motion for mistrial, directed verdict, and to strike testimony. The motion was made by Zeigler's attorney during the testimony of one of Fisher–Price's expert witnesses, James Finneran ("Finneran"). In order to understand the court's ruling on Zeigler's motion and Fisher–Price's arguments in support of its motion for new trial, it is necessary to review some of the language in the Final Pretrial Order entered by the court shortly before trial, and to discuss the events that led up to Zeigler's motion and the court's ruling.

In the trial setting order entered in this case on March 3, 2003 (Doc. No. 40), the court ordered the parties to "prepare, agree upon, and sign a proposed Final Pretrial Order," prepared for the judge's signature "in the format attached to this order." In compliance with this requirement, the parties submitted to the court a proposed Final Pretrial Order, which the court signed and entered on June 26, 2003. (Doc. No. 110) The Final Pretrial Order contained the following language:

IV. **RESTRICTIONS ON WITNESSES:** A witness who may testify at the trial shall not be permitted to hear the testimony of any other witnesses before testifying, and is excluded from the courtroom during the trial until after the witness has completed his or her testimony, unless exclusion of the witness is not authorized by Federal Rule of Evidence 615 or the court orders otherwise. A witness who is excluded from the courtroom pursuant to this paragraph also is prohibited from reviewing a verbatim record of the testimony of other witnesses at the trial until after the witness has completed his or

her testimony, unless the court orders otherwise.

*Unless the court orders otherwise, after the commencement of trial and until its conclusion, a witness who may testify at the trail is prohibited from communicating with anyone about what has occurred in the courtroom during the trial.* If the witness does testify at the trial, after the witness is tendered for cross-examination and until the conclusion of the witness's testimony, the witness is prohibited from communicating with anyone about the subject matter of the witness's testimony. A witness may, however, communicate with his or her attorney about matters of privilege, and may communicate with anyone if the right to do so is guaranteed by the United States Constitution.

These prohibitions do not apply to the parties. *An attorney who may call a witness to testify at trial must, before the trial, advise the witness of these restrictions.*

(Doc. No. 110, p. 6; emphasis added) This language is identical to the language in the suggested Final Pretrial Order "format" attached to the trial scheduling order, and the language was included in the parties' proposed Final Pretrial order without objection.

During the final pretrial conference, counsel for Fisher–Price asked the court if Fisher–Price's expert witnesses would be allowed to be present in the courtroom to hear the testimony of Zeigler's expert witness. The court responded that if Fisher–Price wanted to have its expert witnesses in the courtroom during Zeigler's case, it should bring the matter up during the trial, and the court would rule on the request at that time. (*See* Fisher–Price App., pp. 508–09)

During trial, Zeigler called Daniel Choudek ("Choudek") as a witness. The court previously had ruled that Choudek, a professional engineer, could not give expert opinion testimony at trial because Zeigler had not served on Fisher–Price the disclosures required by Federal Rule of Civil Procedure 26(a)(2)(B).[4] During Zeigler's case-in-chief, the court permitted Choudek to give non-opinion testimony, but reaffirmed its pretrial ruling that Choudek would not be permitted to give expert opinion testimony. (Tr. of Choudek's trial testimony, p. 10) Zeigler's attorney asked the court to consider allowing Choudek to give rebuttal expert testimony, but indicated that because of a death in Choudek's family, Choudek would not be able to return to court at the conclusion of the defense case. (*Id.* p. 11). The court indicated it would reserve ruling on the request until the defense had rested, but suggested

---

4. On April 10, 2003, the court ordered as follows: "The plaintiff is unable to state whether Mr. Choudek's testimony will be required until after receipt of such additional discovery responses as the court may order. At the present time, absent the receipt of further information, the plaintiff does not intend to call Mr. Choudek in her case in chief, but may call him as a rebuttal witness. The court advised the parties that Rule 26 disclosures are required for all experts, whether called in a party's case in chief or as rebuttal witnesses." (Doc. No. 60) The court reserved ruling on the defendant's motion to preclude Choudek's testimony at that time. On June 9,

2003, the court ordered as follows: "On June 5, 2003, the defendant filed a motion (Doc. No. 86) to strike Dan Choudek from the plaintiff's witness list. The defendant seeks to strike Mr. Choudek from testifying at the trial of this case because the plaintiff has not provided expert disclosures with regard to Mr. Choudek. The plaintiff responds that she does not intend to call Mr. Choudek as an expert witness, but only as a fact witness. The motion is granted in part and denied in part. Mr. Choudek will be permitted to testify at trial, but only as a fact witness. He will not be allowed to offer opinion testimony." (Doc No. 88)

Zeigler might consider make an offer of proof concerning the proposed rebuttal testimony. Zeigler's attorney at first was reluctant to disclose the subject of Choudek's rebuttal evidence, but then agreed to do so. (*Id.*, pp. 10–11)

During the offer of proof, Choudek testified, outside the presence of the jury, that Finneran, who was Fisher–Price's primary expert, had misidentified certain wires during his analysis of X-ray photographs taken by Choudek of the remains of the melted Power Wheels toy vehicle. (*Id.*, pp. 11–14, 19–26) Finneran is a professional engineer hired by Fisher–Price to perform a number of "cause and origin" investigations of fires involving Power Wheels toy vehicles. After hearing the offer of proof, the court indicated it likely would not allow the rebuttal evidence because of Zeigler's failure to make the appropriate pretrial disclosures concerning Choudek's testimony, but the court reserved ruling until after Finneran's testimony. (*Id.*, pp. 14–18)

Finneran testified at trial the following day. After describing his background and qualifications, Finneran testified about his "cause and origin" investigation of the Zeigler fire. Within a few days after the fire, Finneran traveled to the scene of the fire to conduct an on-site investigation. Finneran concluded that the fire had, in fact, originated in the garage, but he found a number of possible ignition sources for the fire. He concluded that no scientifically-based conclusions could be drawn as to where in the garage the fire originated. (Fisher–Price App., pp. 471–476)

Finneran next turned to his examination of the remains of Madisen Zeigler's toy vehicle, which took place at Choudek's office in Minnesota. Finneran explained wires from the battery that powered the

toy vehicle could be plugged either into a battery charger, to charge the battery, or into the vehicle itself, to power the vehicle. (*Id.*, p. 490) Finneran displayed to the jury photographs of X-rays of the vehicle that had been admitted into evidence, and explained the photographs, in his opinion, proved the battery was not plugged into the charger at the time of the fire.[5] (*Id.*, pp. 494–96) Based on this evidence, Finneran testified that, to a reasonable degree of scientific certainty, the toy vehicle could be ruled out as a cause of the fire. (*Id.*, pp. 501–02)

During a pretrial deposition, Finneran had made notations on the photographs of the X-rays. On direct examination, Finneran had the following exchange with Fisher–Price's attorney about the photographs and his notations on the photographs:

Q Mr. Finneran, I'm going to show you your photograph number 6. And that looks like a sort of long shot of the X-ray that we were reviewing before. Did you look at this X-ray and attempt to determine if any connectors of the Power Wheels was [sic] connected to any other connectors?

A Yes, I did.

Q And what were your conclusions in that respect?

A. Well, clearly these eight terminals here weren't connected. There is another terminal found in the X-ray right here. *There's a description on this photograph that indicates that initially I thought that this was the battery terminals and the charger terminals and that they were at right angles to each other. Closer analysis of the X-ray shows that this terminal right here actually*

---

**5.** Zeigler had told fire investigators, and testified at trial, that shortly before the fire, she had plugged the battery into the charger to charge the toy vehicle.

*is part of the battery.* So this is a battery terminal right here whereas this would be the charger terminals and the wiring harness terminals.

This terminal would have to be—come all the way over to here or vice versa— these terminals would have to come over here—to be connected to the batteries.

*So even though I was mistaken about these terminals being battery and charger terminals saying they're not connected which they're not,* it's even more difficult to get the battery terminal that is over here, which now I've covered up in green, connected to the charger.

So based on the overall view of this X-ray, there's no damage to any of the conductors. There's no evidence of electrical activity. Arcing or short-circuiting is what I'm looking for. And there's no evidence to suggest that any of the connectors were connected to each other.

Q *Now, you mentioned initially when you wrote your report and reviewed these X-rays you might have thought that the connectors that are close to the arrow were battery connectors. Is that what we just heard?*

A *Yes. Actually I thought this was [a] battery connector and wiring harness connectors because they basically look the same.* The only distinction is the charger connector wiring is a smaller gauge than what the battery wire is and the wiring harness is. *So initially I thought the battery was being charged, so I looked at the X-ray. I just assumed that this was battery and wiring— or battery and charger terminals. But I found the battery terminal sitting over here. So clearly these cannot be—they have to be wiring harness and charger terminals.*

Q *So you initially had the opinion that the battery terminal and the wiring harness terminal were close together but not connected. Does your reevaluation strengthen your opinion even further that the batteries were not connected to anything at the time of the fire?*

A Yes. If you look at the terminal— this is the terminal in the center area here—there is no way that I'm aware of that we could have separated those terminals that great of a distance. And I've done a lot of testing on vehicles specifically looking at terminal placement and condition of terminals after a fire, and I've never seen that.

(*Id.,* pp. 498–501; emphasis added)

On cross examination, the background of Finneran's "closer analysis" became clear:

Q When did you make this discovery that you had [made] a prior mistake as to where the—which terminals were in that plastic?

A Last night.

Q Was it after visiting with your counsel?

A Yes, it was.

Q And after they advised you of what had taken place in the courtroom out of [the] presence of the jury?

DEFENDANT'S ATTORNEY: *Objection Your Honor. This reference is inappropriate.*

THE COURT: Overruled.

A Yes.

(*Id.,* p. 506; emphasis added) Immediately after this exchange, Zeigler's attorney moved to strike Finneran's testimony, and asked the court for a directed verdict. (*Id.*) The jury was excused while the court addressed the issue with the parties.

Zeigler's attorney cited the language in the Final Pretrial Order providing that "after the commencement of trial and until its conclusion, a witness who may testify at the trail is prohibited from communicating with anyone about what has occurred in the courtroom during the trial." He argued he had relied on this provision when he made his proffer of Choudek's testimony, and his planned strategy in cross-examining Finneran was to impeach Finneran's expertise by demonstrating that Finneran had incorrectly identified some of the wires in the X-ray photographs.

One of Fisher–Price's attorneys responded that "the law is absolutely clear" that Federal Rule of Evidence 615 "does not apply to expert witnesses." [6] (*Id.*, pp. 506–07) Later, counsel clarified his comment as follows:

> We certainly did not intend to violate the Court's pretrial order. We did have a brief discussion with the Court prior to trial concerning whether or not experts on behalf of the defense would be permitted to sit in the courtroom and hear plaintiff's experts testify and be in a position to directly respond to that, and I believe the Court told us that if and when that occurred or should we desire to do that to bring that to the Court's attention at that time and the Court would take that up as a separate matter.

(*Id.*, p. 508) Counsel acknowledged "the Court's order was clear" (*id.*, p. 520), and that Fisher–Price's conduct was "clearly sanctionable." (*Id.*, p. 521) Fisher–Price's co-counsel characterized the incident as a "nonevent." (*Id.*, p. 514)

After hearing the arguments of the attorneys, the court held as follows outside the presence of the jury:

> I've thought about this, and I do find that there has been a violation of the Court's pretrial order. The witness was provided with information of a crucial nature from the proceedings in court and contrary to the order of the Court. And although it is different from what the federal rules of evidence provide, it's something the Court ordered and the parties were all entitled to rely upon in their strategies and preparations of the case for trial. In that respect, a sanction is appropriate. The nature of the sanction is difficult for the Court to come up with to be fair and measured but on the other hand to allow for justice to be done.

> \* \* \* \* \* \*

> Concerning the effect, the actual effect, of this mistaken identification [of the wiring], I can't tell what the effect would have been. The witness handled it all very blithely and very effectively in his direct examination. He acknowledged a prior mistake and indicated like he'd stumbled across this and realized he'd made this mistake and gave this smooth-flowing testimony really deceiving the jury[.]

(*Id.*, pp. 523, 527)

The court then advised the jury as follows:

> You've just heard testimony from Mr. Finneran, the expert—one of the two expert witnesses that's been called by the defense. Mr. Finneran basically

---

**6.** Rule 615 provides as follows: "At the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. The rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present."

testified as to two subject matters. First of all, he testified as to his fire scene investigation. And secondly, he testified regarding his review of X-rays and the remains of the Power Wheels toy car which is the Exhibit. 1 that's sitting in front of you, and he testified to several conclusions, and he answered hypothetical questions in both areas.

The—at the beginning of Mr. Finneran's testimony about the X-rays and reviewing that information, you may recall he indicated that he had—when he did his report he had misidentified some of the wires that he observed in the X-rays. It turned out from the first beginning of cross-examination that he learned of that misidentification when he was told last night of some things that happened in the courtroom yesterday and he realized—he was told then of this mistake, and he was able to change his testimony from his earlier report here today when he gave his direct testimony to you. That was a violation of an order that I had entered in this case that basically says that attorneys can't tell their witnesses that are about to testify about what happens here in court. The purpose of that order is to prevent witnesses from being able to correct their testimony before you have a chance to hear it in its original version and counsel has a chance to point out any errors to you so that you can realize if there's some problems or not problems with the case and make appropriate credibility determinations and determine who's telling the truth and what to believe and what to give credit to when you decide the case.

As a result of this problem, I've had to do something to address the situation and to address the violation of my order. So I'm ordering stricken all of Mr. Finneran's testimony regarding the X-rays and the wiring that he made after his visit to the fire scene.

I'm not ordering stricken his testimony regarding the fire scene. Mr. Avery can cross-examine him about that if he wishes, but I am ordering stricken all of his testimony that relates to the X-rays and to his examination of the remains, and you shall disregard all of that testimony.

Also the—you should recall preliminary instruction number 9 that I read to you regarding credibility of witnesses.[7] Mr.

---

7.

**PRELIMINARY INSTRUCTION NO. 2**
**CREDIBILITY OF WITNESSES**

You may believe all of what a witness says, part of it, or none of it. In deciding what testimony to believe, consider a witness's intelligence, memory, motives for testifying a certain way, manner while testifying, whether the witness said something different at an earlier time, the general reasonableness of the testimony, the witness's opportunity to have seen or heard the things about which the witness is testifying, and the extent to which the testimony is consistent with other evidence you believe.

Keep in mind that people sometimes hear or see things differently and sometimes forget things. You should consider whether a witness's mis-recollection has to do with an important fact or only a small detail. You also should consider whether a witness's false or inaccurate testimony is the result of an innocent mis-recollection, a lapse of memory, or an intentional falsehood.

A witness may be discredited, or "impeached," by evidence that is inconsistent with the witness's testimony. This would include evidence that at some earlier time, the witness said or did something, or failed to say or do something, that is inconsistent with the witness's testimony in the trial. It is for you to decide whether or not a witness has been impeached. If you decide a witness has been impeached, and thus discredited, you may choose to disbelieve all or part of the witness's testimony. On the other hand, you may choose to believe a witness's testimony even though the witness has been impeached.

Finneran did acknowledge that his testimony here was different from what was in his report and what he testified to at an earlier deposition. When a witness has been discredited or impeached, you may, if you decide to do so, disregard all of his testimony. You don't have to do that. You can read instruction number 9, and I would ask you to look at it carefully. It's preliminary instruction number 9; I already read it to you. When you go to do your deliberations, you can read it again and decide the weight, if any, you want to give to the remainder of Mr. Finneran's testimony. That's entirely up to you to decide based on your own collective judgments as to how you view credibility.

(*Id.*, pp. 529–32)

Fisher–Price argues a new trial should be granted in this case because the court "committed a clear abuse of discretion resulting in clear and unmistakable error." (Doc. No. 136, p. 4.) The court disagrees.

█ Fisher–Price first argues that under subparagraph 3 of Federal Rule of Evidence 615, the court is not authorized to exclude an expert witness from the courtroom. Actually, the referenced subparagraph of the Rule provides that "the rule does not authorize" the court to exclude "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Fisher–Price is correct that some authorities have held an expert witness might, in certain circumstances, be such a person.

The most obvious flaw in the application of this argument to the present case is Fisher–Price never attempted to make a showing that Finneran's presence in the courtroom during Choudek's testimony was essential to the presentation of Fisher–Price's case. Without such a showing, the exception to the rule does not apply. Furthermore, the issue here does not arise from an application of Rule 615, or from

the exclusion of Finneran from the courtroom during Choudek's testimony. Rather, the problem arose because Fisher–Price's attorneys violated the express terms of the court's Final Pretrial Order. The attorneys did so when they "woodshedded" their witness, Finneran, based on what they heard during Choudek's offer of proof. Fisher–Price did so intentionally and without asking the court for relief from the Final Pretrial Order.

Fisher–Price cites a number of cases where courts have held either that a party had not violated the terms of a specific sequestration order or a trial court had not abused its discretion in denying a request for sanctions because of a violation of a sequestration order. None of these authorities supports an argument that a party can intentionally violate a sequestration order without fear of sanctions being imposed as a result of the violation.

The court's pretrial order provided that, "[u]nless the court orders otherwise, after the commencement of trial and until its conclusion, a witness who may testify at the trail is prohibited from communicating with anyone about what has occurred in the courtroom during the trial," and "[a]n attorney who may call a witness to testify at trial must, before the trial, advise the witness of these restrictions." Fisher–Price makes no argument that there is any ambiguity or confusion in the language or scope of this order, and the court does not see how such an argument reasonably could be made. In fact, Fisher–Price freely admitted the violation at trial. Fisher–Price was sanctioned for violating the order, and for no other reason.

Whether as a result of intent or neglect, Fisher–Price's attorneys were not authorized simply to ignore the terms of the Final Pretrial Order. That is exactly what they did. They used information they learned from testimony given by a

witness called by the plaintiff during an offer of proof at trial to help their expert witness reshape his testimony to best address, in advance, a serious problem the witness otherwise would have had to face on cross-examination. The careful and measured handling of the subject during Finneran's direct examination demonstrates the excellent results they received from their efforts.[8] When Zeigler's attorney questioned, at the beginning of cross-examination, how Finneran had learned of the mistake he had made when he first reviewed the photographs of the X-rays, Fisher–Price's counsel immediately, and cryptically, objected ("Objection Your Honor. This reference is inappropriate."). The fact that Fisher–Price's counsel was attempting to keep this information from the court and the jury supports a conclusion that counsel was aware woodshedding Finneran was not appropriate. The position Fisher–Price's counsel took at trial when the problem surfaced—that the entire situation was a "nonevent"—only compounds the problem.

Fisher–Price also argues Finneran did not, in fact, change his testimony from what he had said in his pretrial deposition. From the court's review of Finneran's deposition, it appears that he did change his testimony, at least with respect to the notes he made on photographs of the X-rays he referenced during his deposition. (*See* Fisher–Price App., pp. 435–39) However, whether the change in his testimony was from the deposition, from notes he made on the photographs of the X-rays, or from somewhere else, is of no consequence. Finneran, himself, admitted during his testimony at trial that he had changed some of the conclusions he had reached during his initial review of the X-rays, and changed his expert opinions, based on information provided to him by Fisher–Price's attorneys on the evening before his testimony.

Similarly, Fisher–Price argues the corrected information they provided to Finneran actually helped to strengthen Finneran's opinions, which made Fisher–Price's case even stronger. This argument fails as a matter of logic—it suggests a party is justified in intentionally violating an order of the court if the violation would help the party win its case. If that were true, the pretrial orders of the court would be meaningless. In any event, the argument misses the point. Zeigler's attorney's strategy was to confront Finneran with his mistake, and use the fact that Finneran had made a mistake to attack his expertise. Because Zeigler's attorney did not want Fisher–Price to learn of the mistake before trial, he gambled by not properly designating Choudek as an expert witness. As a result, the court prohibited Choudek from testifying as an expert at trial. Zeigler's attorney nevertheless had Choudek appear at trial to give some nonexpert testimony, and to be available to testify as a rebuttal witness, if allowed by the court. Because of a death in his family, Choudek was not going to be available for Zeigler's rebuttal case, so Zeigler's attorney, relying on the "restrictions on witnesses" provision in the Final Pretrial Order, reluctantly decided to make an offer of proof of Choudek's proposed rebuttal testimony. Fisher–Price's attorneys capitalized on the information they learned from the offer proof to coach Finneran. This was a clear violation of the terms of the Final Pretrial Order. The fact that this information helped Fisher–Price's case does not justify or excuse the violation; rather, it establishes that the violation was prejudicial to Zeigler.

---

**8.** *See* the emphasized portions of Finneran's direct examination quoted above.

■ Fisher–Price argues at length about the fact that Zeigler did not comply with expert disclosure requirements in connection with Choudek's proposed expert testimony. It is clear Zeigler intentionally neglected to serve expert disclosures for Choudek because Zeigler did not want to alert Fisher–Price to Finneran's error in interpreting the X-rays. No rule, law, or order of this court required Zeigler's attorney to serve expert disclosures for Choudek, although the rules do provide that by not serving such disclosures, Zeigler's attorney risked Choudek's expert testimony being excluded from the evidence at trial. Zeigler's attorney took the risk, and lost. As a result, he was prohibited from calling Choudek as an expert witness.

This does not mean, however, that Zeigler's attorney was prohibited from cross-examining Finneran about Finneran's mistake. Finneran might have acknowledged his mistake on cross-examination. If he had not, the court might have allowed Zeigler to use Choudek as a rebuttal expert witness. None of this happened, however, because Fisher–Price preempted the matter by telling Finneran about his mistake before he testified.

Fisher–Price argues it should have been permitted to allow Finneran in the courtroom during Choudek's testimony, and if Finneran had been present to hear Choudek's testimony, the problem would not even have arisen. The court does not agree with this argument. This is not a case where there was any valid reason for the defense expert to be present in the courtroom during the trial to hear the testimony of the plaintiff's expert. Here, a rebuttal witness was called by Zeigler out of order to rebut the expected testimony of a defense expert. Fisher–Price's attorneys then took this information and used it to rehabilitate their expert in advance, before he was even called to testify at trial. This is precisely the type of wrong the court was attempting to prevent in the Final Pretrial Order.

Fisher–Price claims the Final Pretrial Order "was without legal authority to prohibit defense counsel from conferring with expert witnesses regarding *surprise expert testimony* as this is contrary to Federal Rule of Evidence 703 and Federal Rule of Evidence 615." (Doc. No. 136, ¶ 6; emphasis added) Under these facts, Fisher–Price's argument is absurd. Had Choudek testified in rebuttal to Finneran's testimony, Finneran would not have had an advance opportunity to learn of Choudek's "surprise" testimony, and would have had no opportunity to correct his mistake prior to testifying in the case.

■ Fisher–Price argues further that the curative instruction given to the jury was improper. The court disagrees. The curative instruction was tailored to address the particular wrong that resulted from Fisher–Price's violation of the court's order. Federal Rule of Civil Procedure 16(f) provides that if a party or a party's attorney fails to obey a pretrial order, the judge may make such orders are just, including the orders provided in Rule 37(b)(2)(B) and (C).[9] The curative instruction given by the court was well within what is authorized by the Rules.

■ Finally, Fisher–Price attempts to cast the court's Final Pretrial Order in the guise of a local rule that merely imposed a

---

9. Federal Rule of Civil Procedure 37(b) provides that if a party fails to obey an order entered under Rule 26(f), the court may make such orders regarding the failure as are just, including "(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]"

"requirement of form." This argument completely misses the mark. The Final Pretrial Order is not a local rule, nor is its format suggested within the court's Local Rules. Rather, the Pretrial Order is an order of the court that carries equal force to any other order. As the Eighth Circuit Court of Appeals explained in *Anderson v. Genuine Parts Co.,* 128 F.3d 1267 (8th Cir.1997):

> The Pretrial Order supersedes all previous pleadings and "control[s] the subsequent course of the action unless modified by a subsequent order." Fed. R.Civ.P. 16(e). This court has previously ruled that, " '[t]he pretrial order measures the dimensions of a lawsuit.' " *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1335 (8th Cir.1985) (quoting *Seneca Nursing Home v. Secretary of Social & Rehabilitation Servs. of Kansas,* 604 F.2d 1309, 1314 (10th Cir. 1979)). "Accordingly, a party may not offer evidence or advance theories during trial which violate the terms of a pretrial order." *Hale,* 756 F.2d at 1335 (citing *United States v. First Nat'l Bank of Circle,* 652 F.2d 882, 886 (9th Cir. 1981)).

*Id.,* 128 F.3d at 1271 (holding court did not err in relying on Pretrial Order to define parameters of trial and exclude evidence); *accord Ross v. Garner Printing Co.,* 285 F.3d 1106, 1114 (8th Cir.2002). Similarly, a party may not coach its witnesses in violation of a pretrial order.

**2. *Ruling on admissibility of press release***

Plaintiff's Exhibit 5, a copy of the Consumer Product Safety Commission (CPSC) press release announcing the Power Wheels recall, was admitted into evidence at trial over Fisher–Price's objections set forth in the Final Pretrial Order. (*See* Tr. of Zeigler's trial testimony, p. 41) In the Final Pretrial Order, Fisher–Price set out the following objections to the exhibit:

"Objection: FRE 401, FRE 403, FRE 407(subsequent remedial measures) and FRE 408 (inadmissible settlement agreement)."

The press release in question stated the following:

> WASHINGTON, D.C.—In cooperation with the U.S. Consumer Product Safety Commission (CPSC), Fisher–Price, of East Aurora, N.Y., is conducting a voluntary recall involving up to 10 million battery-powered Power Wheels ride-on cars and trucks. The vehicles' electrical components can overheat and cause fires. Children can suffer injuries from fires and house fires can occur. Additionally, wiring problems can prevent the vehicles from stopping.
>
> CPSC and Fisher–Price have received approximately 700 reports of electrical components failing and overheating while the cars and trucks were being ridden, charged, parked or stored. About 150 fires have been reported. Nine children suffered minor burns to the hands, legs, or feet; and up to $300,000 in property damage to 22 houses and garages have been reported. There have also been 71 reports of vehicles not stopping. Six children suffered bruises, scratches or bumps when their vehicles hit a car, truck, pole, window or fence.
>
> Power Wheels Service Centers will repair the vehicles. These service centers will install the new parts free of charge and give all recalled vehicles a free safety check-up and tune-up.
>
> The recalled Power Wheels cars and trucks have been sold under nearly 100 model names. The Power Wheels logo and the model name are on each vehicle. All models with two batteries are recalled, and certain models with one battery are recalled. The company will help consumers identify if their model is part of the recall. Power Wheels cars

and trucks intended for children 2 to 7 years old, and the vehicles' speed ranges from 1 to 5 mph, depending on the model.

Toy and mass merchandise stores nationwide sold the cars and trucks since 1984 for about $70 to $300.

Consumers should remove the vehicles' batters right away and not let children use these Power Wheels vehicles until the repair has been made at the service center. To schedule the repair, consumers should call Power Wheels at (800) 977–7800 anytime. Again, the company will help consumers identify if their vehicles a part of the recall.

(Plaintiff's Ex. 5)

Fisher–Price argues it was error to admit the exhibit for the following reasons: (1) the exhibit was not relevant because it referenced accidents dissimilar to the instant case; (2) the facts of the recall had no bearing on the facts involved in this case; (3) any probative value of the evidence was outweighed by its unfair prejudice and propensity to confuse the jury; and (4) the exhibit contained inadmissible hearsay. Fisher–Price further argues the court should order a new trial because of this error. The court disagrees that it was error to admit the exhibit. Even if it was error to admit the exhibit, the court finds the error would be harmless, and would not justify a new trial.

■ The underpinning of all the objections is Fisher–Price's contention that the CPSC forced Fisher–Price to enter into a settlement agreement, and the press release therefore did not constitute a voluntary admission on the part of Fisher–Price. A better description of the agreement, and

the recall, is that Fisher–Price, at the suggestion of the CPSC, instituted a voluntary recall of Power Wheels toy vehicles. The issuance of the press release was a voluntary act by Fisher–Price, and an admission under Federal Rule of Evidence 801(d)(2)(A), (B), and (C).[10] *See Farner v. Paccar, Inc.*, 562 F.2d 518, 526–27 (8th Cir.1977) (trial court did not err in admitting into evidence memoranda and recall letter re truck). Fisher–Price could hardly argue otherwise—it touted the recall notice and the other forms of notification it provided to the public in its successful defense of Zeigler's failure-to-warn claim.

■ Fisher–Price complains that the press release refers to matters that are not relevant to the facts of the present case. While this is true, the irrelevance of those matters is clear from the language of the press release itself. The jury easily was able to separate those matters from information in the exhibit that was relevant to the present case. For example, the recall notice refers to situations where the vehicle does not properly stop while being ridden. The jury knew stopping was not an issue in the present case, and would have known this was not relevant evidence. To the extent such matters should not have been placed before the jury, any error was harmless.[11] This is because, for the most part, the statements in the press release were directly relevant to the issues in the present case.

■ The main thrust of the press release was that "electrical components [of Power Wheels toy vehicles] can overheat and cause fires." There is no question that this admission is relevant to the fighting issues in the present case. The lan-

---

**10.** To the extent the press release can be construed as stating conclusions or opinions of the CPSC, it also was admissible under Federal Rule of Evidence 803(8)(c). *See Patterson v. Central Mills, Inc.*, 64 Fed.Appx. 457, 462 (6th Cir.2003) (citing *Beech Aerospace*

*Servs., Inc. v. Rainey*, 488 U.S. 153, 162, 109 S.Ct. 439, 446, 102 L.Ed.2d 445 (1988)).

**11.** Notably, no party requested the exhibit be redacted to exclude the non-relevant language.

guage makes it "more probable" that the Madisen Zeigler's toy vehicle overheated and caused the fire, the very definition of relevance in Federal Rule of Evidence 401.

■ Fisher–Price further argues the language in the press release was hearsay because it was "mandated by the CPSC." (Doc. No. 136, p. 19) The press release was issued as a part of a voluntary settlement agreement entered into between the CPSC and Fisher–Price. Fisher–Price apparently is claiming that even though the voluntary settlement agreement included, as one of its terms, the issuance of a press release to announce a product recall, the press release was "mandated" by the CPSC. The court rejects this argument.

### 3. Ruling on testimony of Bruce Wandell

Fisher–Price argues the court erred in denying its motion to preclude the testimony of Bruce Wandell, claiming Wandell's testimony "did not meet the requirements for admissibility under Rule 703, Daubert and its progeny." (Doc. No. 136, ¶ 11) Fisher–Price has offered no evidence or argument to alter the court's opinion regarding the admissibility of Wandell's testimony, set forth in the court's Order on Motions to Preclude Expert Testimony and to Bifurcate, entered on July 1, 2003. (Doc. No. 112)

### 4. Rule 50(c) Analysis

The court's partial grant of Fisher–Price's motion for judgment as a matter of law affects the court's consideration of Fisher–Price's motion for new trial. As the Eighth Circuit Court of Appeals has explained:

> Rule 50(c) of the Federal Rules of Civil Procedure requires that the district court, in ruling on a motion for judgment as a matter of law where a motion for new trial is also pending, conditionally rule on the new trial motion.

*Mears v. Nationwide Mutual Ins. Co.,* 91 F.3d 1118, 1123 (8th Cir.1996). *See Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 322–23, 87 S.Ct. 1072, 1077, 18 L.Ed.2d 75 (1967); Fed.R.Civ.P. 50(c)(1). Such "conditional ruling" must assume that judgment as a matter of law was granted erroneously and will be reversed or vacated. Fed.R.Civ.P. 50(c)(1) Advisory Committee notes. The court must "specify the grounds for granting or denying the motion for the new trial." Fed.R.Civ.P. 50(c)(1).

The court's rulings regarding the testimony of James Finneran and Bruce Wandell, and the admissibility of the CPSC press release, would not change if an appellate court overturned the court's entry of judgment as a matter of law. The court's entry of judgment as a matter of law is not predicated upon any of the grounds raised in Fisher–Price's motion for new trial. Accordingly, the court **conditionally denies** Fisher–Price's motion for new trial, as provided by Rule 50(c)(1).

### IV. CONCLUSION

For the reasons discussed above, the court **grants in part and denies in part** Fisher–Prices motion for judgment as a matter of law (Doc. No. 138), and **conditionally denies** Fisher–Price's motion for new trial (Doc. No. 36). Judgment as a matter of law is entered for Fisher–Price on Zeigler's punitive damages and design defect claims, and the judgment will be amended accordingly. The verdict on Zeigler's claim for breach of the implied warranty of merchantability is **affirmed,** and the judgment for compensatory damages remains as entered.

**IT IS SO ORDERED.**